08-3331-cv
*Starbucks Corp. v. Wolfe's Borough*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2008

Docket No. 08-3331-cv

Argued: June 22, 2009                 Decided: December 3, 2009

---

STARBUCKS CORPORATION, a Washington corporation, STARBUCKS U.S. BRANDS, L.L.C.,

*Plaintiffs-Counter-Defendants-Appellants*,

- v.-

WOLFE'S BOROUGH COFFEE, INC., a New Hampshire corporation doing business as Black Bear Micro Roastery,

*Defendant-Counter-Claimant-Appellee.*

---

Before: MINER and LIVINGSTON, <u>Circuit Judges</u>, and TRAGER, <u>District Judge</u>.[*]

Appeal from a judgment entered on June 5, 2008, in the United States District Court for the Southern District of New York (Swain, <u>J.</u>) in favor of defendant-appellee, the court having found after a bench trial that plaintiffs-appellants failed to prove, <u>inter alia</u>, their federal dilution claim brought pursuant to the Lanham Act because there was no likelihood that defendant's use of "Mr. Charbucks" and "Charbucks Blend" to describe a particular type of coffee would dilute — by either blurring or tarnishment — plaintiffs' "Starbucks" mark.

Affirmed in part and vacated in part.

> MARK N. MUTTERPERL, John C. Rawls, and Sarah Silbert, Fulbright & Jaworski L.L.P., New York, New York, <u>for plaintiffs-counter-defendants-appellants</u>.
>
> CHRISTOPHER COLE and John-Mark Turner, Sheehan, Phinney, Bass + Green, P.A., Manchester, New Hampshire, <u>for defendant-counter-claimant-appellee</u>.

---

[*] The Honorable David G. Trager, District Judge, United States District Court for the Eastern District of New York, sitting by designation.

MINER, Circuit Judge:

Plaintiffs-appellants, Starbucks Corporation and Starbucks U.S. Brands, LLC (together, "Starbucks"), appeal from a judgment entered on June 5, 2008, in the United States District Court for the Southern District of New York (Swain, J.), following a bench trial, in favor of defendant-appellee, Wolfe's Borough Coffee, Inc., d/b/a Black Bear Micro Roastery ("Black Bear"). The District Court found that Starbucks failed to demonstrate entitlement to relief on its (1) federal trademark infringement, dilution, and unfair competition claims brought pursuant to the Lanham Act, 15 U.S.C. §§ 1114(1), 1125, 1127; (2) state trademark dilution claims brought pursuant to New York Gen. Bus. Law § 360-*l*; and (3) unfair competition claim under New York common law. We vacate, in part, the District Court's decision and remand for further proceedings on the issue of whether Starbucks demonstrated a likelihood of dilution by "blurring" under federal trademark law. In all other respects, the judgment of the learned District Court is affirmed.

## I.  BACKGROUND

### A.  Preliminary Facts

Starbucks, a company primarily engaged in the sale of coffee products, was founded in Seattle, Washington in 1971. Since its founding, Starbucks has grown to over 8,700 retail locations in the United States, Canada, and 34 foreign countries and territories. In addition to operating its retail stores, Starbucks supplies its coffees to hundreds of restaurants, supermarkets, airlines, sport and entertainment venues, motion picture theaters, hotels, and cruise ship lines. Starbucks also maintains an internet site that generates over 350,000 "hits" per week from visitors.

In conducting all of its commercial activities, Starbucks prominently displays its registered "Starbucks" marks (the "Starbucks Marks") on its products and areas of business. The Starbucks Marks include, inter alia, the tradename "Starbucks" and its logo, which is circular and generally contains a graphic of a mermaid-like siren encompassed by the phrase "Starbucks

Coffee." Starbucks "has been the subject of U.S. trademark registrations continuously since 1985" and has approximately 60 U.S. trademark registrations. Starbucks also has foreign trademark registrations in 130 countries.

From fiscal years 2000 to 2003, Starbucks spent over $136 million on advertising, promotion, and marketing activities. These promotional activities included television and radio commercials, print advertising, and in-store displays, and "prominently feature[d] (or, in the case of radio, mention[ed]) the Starbucks Marks, which Starbucks considers to be critical to the maintenance of its positive public image and identity." Starbucks also enhanced its commercial presence by permitting the use of its products and retail stores in Hollywood films and popular television programs. These films and programs contained scenes in which the Starbucks Marks were also "prominently displayed."

As may be expected from its spending "substantial time, effort and money advertising and promoting the Starbucks Marks throughout the United States and elsewhere," Starbucks devotes "substantial effort to policing its registered Starbucks Marks." Starbucks "has a regular practice of using watch services and other methods to identify potential infringers of the Starbucks Marks," and it "routinely sends cease and desist letters and, if necessary, commences litigation in support of these efforts."

Black Bear, also a company engaged in the sale of coffee products, has its principal place of business in Tuftonboro, New Hampshire. In contrast to Starbucks, Black Bear is a relatively small company owned by Jim Clark and his wife. It is a family-run business that "manufactures and sells . . . roasted coffee beans and related goods via mail order, internet order, and at a limited number of New England supermarkets." Black Bear also sold coffee products from a retail outlet called "The Den," in Portsmouth, New Hampshire. To help operate its business, Black Bear hires some part-time employees, such as "one girl who comes in two days a week and helps with packaging," but Black Bear is otherwise operated by Mr. and Mrs. Jim Clark, with the occasional help of their two daughters.

In April 1997, Black Bear began selling a "dark roasted blend" of coffee called "Charbucks Blend" and later "Mister Charbucks" (together, the "Charbucks Marks"). Charbucks Blend was sold in a packaging that showed a picture of a black bear above the large font "BLACK BEAR MICRO ROASTERY." The package informed consumers that the coffee was roasted and "Air Quenched" in New Hampshire and, in fairly large font, that "You wanted it dark . . . You've got it dark!" Mister Charbucks was sold in a packaging that showed a picture of a man walking above the large font "Mister Charbucks." The package also informed consumers that the coffee was roasted in New Hampshire by "The Black Bear Micro Roastery" and that the coffee was "ROASTED TO THE EXTREME . . . FOR THOSE WHO LIKE THE EXTREME."

Not long after making its first sale of Charbucks Blend, in August 1997, Starbucks demanded that Black Bear cease use of the Charbucks Marks. Having felt wrongly threatened by Starbucks, and believing that "[w]e hadn't done anything wrong," Black Bear ultimately decided to continue selling its "Charbucks Blend" and "Mister Charbucks." Mr. Clark later testified, "[m]y main objection was that basically this was a large corporation coming at me and saying, telling us what to do, and, oh, by the way you're going to pay for it, too. . . . [S]ome of the requests that they were making were really off the wall."

B.      Complaint and Trial

After failed negotiations with Black Bear, on July 2, 2001, Starbucks filed a complaint in the District Court, alleging trademark dilution in violation of 15 U.S.C. §§ 1125(c), 1127; trademark infringement in violation of 15 U.S.C. § 1114(1); unfair competition in violation of 15 U.S.C. § 1125(a); trademark dilution in violation of New York Gen. Bus. Law § 360-*l*; deceptive acts and business practices and false advertising in violation of New York Gen. Bus. Law §§ 349, 350; and unfair competition in violation of New York common law.[1]

---

[1] In an order dated September 28, 2004, the District Court granted, in part, Black Bear's cross-motion for summary judgment and dismissed Starbucks' claim under N.Y. Gen. Bus. Law §§ 349, 350 for deceptive acts and business practices and false advertising. On appeal, Starbucks does not contest this dismissal.

A two-day bench trial was held on March 15, 2005, and March 17, 2005.  Among the evidence proffered during trial, Starbucks introduced the testimony of Warren J. Mitofsky ("Dr. Mitofsky"), a scientist in the field of consumer research and polling.  His testimony explained the results of his survey, which concluded in part that "[t]he number one association of the name 'Charbucks' in the minds of consumers is with the brand 'Starbucks' . . . [and that] [t]he name 'Charbucks' creates many negative associations in the mind of the consumer when it comes to describing coffee."  Dr. Mitofsky testified that the surveyed sample of persons were "designed to be representative of the United States" and that he believed a telephone survey of 600 adults in the United States would "do a good job of random sampling."  Dr. Mitofsky summarized the scope of his survey: "Well, if you want to know the reaction to the name Charbucks, then the telephone is perfectly adequate.  If you want to measure the reaction or the familiarity with other visual cues, then it's not the right method."

On December 22, 2005, the District Court issued an opinion and order ruling in favor of Black Bear and dismissing Starbucks' complaint.  Among its findings, the court determined that there was neither actual dilution to establish a violation of the federal trademark laws nor any likelihood of dilution to establish a violation of New York's trademark laws.  The court also found that Starbucks failed to prove its trademark infringement and unfair competition claims because there was no likelihood that consumers would confuse the Charbucks Marks for the Starbucks Marks.

C.      Subsequent Proceedings

Starbucks appealed the District Court's judgment, and, while the appeal was pending, Congress amended the trademark laws by passing the Trademark Dilution Revision Act of 2005 (the "TDRA").  See Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (per curiam).  The TDRA was in response to the Supreme Court's decision in Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 433 (2003), in which the Supreme Court held that the Federal Trademark Dilution Act required a showing of "actual dilution" in order to establish a

dilution claim.  See Starbucks Corp., 477 F.3d at 766.  The TDRA amended the Federal Trademark Dilution Act to provide, inter alia, that the owner of a famous, distinctive mark is entitled to an injunction against the use of a mark that is "likely" to cause dilution of the famous mark.  15 U.S.C. § 1125(c)(1).  In light of the change in law, we vacated the judgment of the District Court and remanded for further proceedings.  Starbucks Corp., 477 F.3d at 766.  In so doing, we noted that "[a]lthough the district court also considered whether Starbucks had shown a likelihood of dilution under New York Gen. Bus. Law § 360-l, it is not clear that that statute is coextensive with the amended statute."  Id.

On remand, the District Court accepted additional briefing from both parties.  Both parties agreed that no further evidentiary proceedings were required.  On June 5, 2008, the District Court again entered judgment in favor of Black Bear, finding — for substantially the same reasons detailed in the court's December 2005 decision but with additional analysis with respect to the federal dilution claim — that Starbucks failed to demonstrate an entitlement to relief on its federal and state claims.  Starbucks timely appealed the District Court's June 5, 2008 judgment.

On appeal, Starbucks primarily argues (1) that the District Court erred in finding that the Charbucks Marks are not likely to dilute the Starbucks Marks under federal and state law; and (2) that the District Court erred in its factual findings and balancing of the relevant factors for determination of "likelihood of confusion" with respect to Starbucks' infringement and unfair competition claims.

## II.  DISCUSSION

### A.  Standard of Review

We ordinarily review a district court's factual findings for clear error and its "conclusions of law and its resolution of mixed questions of law and fact" de novo.  See Design Strategy, Inc. v. Davis, 469 F.3d 284, 300 (2d Cir. 2006).  In the trademark context, we review the district court's determinations as to each separate factor in Polaroid's multifactor test, see Polaroid Corp.

6

v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), for clear error, while the court's ultimate balancing of those factors is a matter of law subject to de novo review, see Star Indus. v. Bacardi & Co., Ltd., 412 F.3d 373, 384 (2d Cir. 2005).

B.        Federal Trademark Dilution

Under federal law, an owner of a "famous, distinctive mark" is entitled to an "injunction against the user of a mark that is 'likely to cause dilution' of the famous mark."  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (per curiam) (quoting 15 U.S.C. § 1125(c)(1)).  Although the requirement that the mark be "famous" and "distinctive" significantly limits the pool of marks that may receive dilution protection, see Savin Corp. v. Savin Group, 391 F.3d 439, 449 (2d Cir. 2004), that the Starbucks Marks are "famous" within the meaning of 15 U.S.C. § 1125(c) is not disputed by the parties in this case.  Rather, the focus of this appeal is on dilution itself.  As specified by statute, federal dilution is actionable in two situations: (1) dilution by "blurring" and (2) dilution by "tarnishment."  15 U.S.C. § 1125(c).

1.        Dilution by Blurring

Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," 15 U.S.C. § 1125(c)(1); see also Deere & Co. v. MTD Products, Inc., 41 F.3d 39, 43 (2d Cir. 1994); Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 219 (2d Cir. 1999).  Some classic examples of blurring include "hypothetical anomalies as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth."  See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1031 (2d Cir. 1989) (internal quotation marks omitted); see also id. (stating that the primary concern in blurring actions is preventing "the whittling away of an established trademark's selling power through its unauthorized use by others.").

Federal law specifies six non-exhaustive factors for the courts to consider in determining

whether there is dilution by blurring:

> (i) The degree of similarity between the mark or trade name and the famous mark.
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
> (iv) The degree of recognition of the famous mark.
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
> (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B)(i)-(vi); cf. ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 168 (2d Cir. 2007). The District Court found that the second, third, and fourth factors favored Starbucks, and those findings are not challenged in this appeal.

With respect to the first factor — the degree of similarity between the marks — the District Court did not clearly err in finding that the Charbucks Marks were minimally similar to the Starbucks Marks. Although "Ch"arbucks is similar to "St"arbucks in sound and spelling, it is evident from the record that the Charbucks Marks — as they are presented to consumers — are minimally similar to the Starbucks Marks. The Charbucks line of products are presented as either "Mister Charbucks" or "Charbucks Blend" in packaging that displays the "Black Bear" name in no subtle manner, and the packaging also makes clear that Black Bear is a "Micro Roastery" located in New Hampshire. See Playtex Prods., Inc., 390 F.3d at 167-68 (considering "the differences in the ways [the marks] are presented" in determining similarity in dilution action); cf. Star Indus., 412 F.3d at 386 ("In assessing similarity [in the infringement context], courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." (internal quotation marks omitted)). Moreover, Black Bear's package design for Charbucks coffee is "different in imagery, color, and format from Starbucks' logo and signage."[2] For example, either a graphic of a bear or a male person is associated with Charbucks, and those

_____

[2] The parties do not challenge the District Court's determination as to the difference in color between the two marks.

8

marks are not comparable to the Starbucks graphic of a siren in pose, shape, art-style, gender, or overall impression. Indeed, the Starbucks siren appears nowhere on the Charbucks package. To the extent the Charbucks Marks are presented to the public through Black Bear's website, the dissimilarity between the marks is still evident as the Charbucks brand of coffee is accompanied by Black Bear's domain name, www.blackbearcoffee.com, and other products, such as shirts and cups, displaying Black Bear's name.

Furthermore, we note that it is unlikely that "Charbucks" will appear to consumers outside the context of its normal use, since "Charbucks" is not directly identifiable with the actual product, i.e., coffee beans. Cf. Nabisco v. PF Brands, Inc., 191 F.3d 208, 213, 218 (2d Cir. 1999) (observing that Pepperidge Farm's famous "goldfish" mark may be identified outside of the packaging because the goldfish cracker itself is the famous mark). The term "Charbucks" appears only on the packaging and on Black Bear's website — both mediums in which the Charbucks Marks' similarity with Starbucks is demonstratively minimal — and Starbucks has not identified any other method by which the Charbucks Marks likely would be presented to the public outside the context of its normal use. Cf. id. at 218 ("[M]any consumers of [the defendant's] crackers will not see the box; they will find goldfish-shaped cheddar cheese crackers served in a dish at a bar or restaurant or friend's house, looking very much like the familiar Pepperidge Farm Goldfish product."). To be sure, consumers may simply refer to "Mister Charbucks" or "Charbucks Blend" in conversation; however, it was not clearly erroneous for the District Court to find that the "Mister" prefix or "Blend" suffix lessened the similarity between the Charbucks Marks and the Starbucks Marks in the court's overall assessment of similarity.[3]

---

[3] We acknowledge that there is some obvious similarity between the core terms "Charbucks" and "Starbucks." As explained below, the existence of some — but not substantial — similarity between the subject marks may be sufficient in some cases to demonstrate a likelihood of dilution by blurring. Thus, upon reconsideration of the application of the blurring factors, the absence of "substantial similarity" will not preclude the District Court from concluding that there is a likelihood of an "association arising from the similarity between [the Charbucks Marks and Starbucks Marks] that impairs the distinctiveness of the [Starbucks

Inasmuch as Starbucks argues that the District Court clearly erred in concluding that Charbucks is not a stand-alone identifier of Black Bear's products, we find Starbucks' argument to be unpersuasive. Starbucks asserts that the District Court should have ignored the term "Mister" or "Blend" before or after "Charbucks" in assessing the "degree of similarity" factor because those terms are generic and "too weak to serve a brand-identifying function." This argument to ignore relevant evidence is unfounded in the law. See 15 U.S.C. § 1125(c)(2)(B); accord H.R. Report No. 109-23, at 7 (2005), reprinted in 2006 U.S.C.C.A.N. 1091, 1096 (emphasizing that "a court is permitted to consider all relevant factors in determining the presence of dilution by blurring"). And in any event, even if the core term "Charbucks" were used to identify a product as a stand-alone term, such finding would not be dispositive of the District Court's overall assessment of the degree of similarity. See Playtex Prods., Inc., 390 F.3d at 167-68. In this case, the District Court's reasons for a finding of minimal similarity between the Charbucks Marks and the Starbucks Marks were well supported by the record, as explained above.

Upon its finding that the marks were not substantially similar, however, the District Court concluded that "[t]his dissimilarity alone is sufficient to defeat [Starbucks'] blurring claim, and in any event, this factor at a minimum weighs strongly against [Starbucks] in the dilution analysis." We conclude that the District Court erred to the extent it required "substantial" similarity between the marks, and, in this connection, we note that the court may also have placed undue significance on the similarity factor in determining the likelihood of dilution in its alternative analysis.

Prior to the TDRA, this Court has held that "[a] plaintiff cannot prevail on a state or federal dilution claim unless the marks at issue are 'very' or 'substantially similar.'" Playtex Prods., Inc., 390 F.3d at 167. Notably, under the pre-TDRA law, the federal statute provided a remedy for dilution of famous marks but did not define "dilution," much less inform the courts of

Marks]." See 15 U.S.C. § 1125(c)(2)(B), (c)(2)(B)(i).

10

the importance of "similarity" in the dilution analysis.

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark . . . .

15 U.S.C. § 1125(c) (2000). Our adoption of a "substantially similar" requirement for federal dilution claims, see Playtex Prods., Inc., 390 F.3d at 167, can likely be attributed to the lack of guidance under the former federal statute and the existence of a "substantially similar" requirement under state dilution statutes, which were better defined, see generally Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 174-76 (2d Cir. 2000); Meade Data, 875 F.2d at 1028-29.

The post-TDRA federal dilution statute, however, provides us with a compelling reason to discard the "substantially similar" requirement for federal trademark dilution actions. The current federal statute defines dilution by blurring as an "association arising from the similarity between a mark . . . and a famous mark that impairs the distinctiveness of the famous mark," and the statute lists six non-exhaustive factors for determining the existence of an actionable claim for blurring. 15 U.S.C. § 1125(c)(2)(B). Although "similarity" is an integral element in the definition of "blurring," we find it significant that the federal dilution statute does not use the words "very" or "substantial" in connection with the similarity factor to be considered in examining a federal dilution claim. See 15 U.S.C. § 1125(c); Bonime v. Avaya, Inc., 547 F.3d 497, 502 (2d Cir. 2008) ("In determining the proper interpretation of a statute, this court will look first to the plain language of a statute and interpret it by its ordinary, common meaning." (internal quotation marks omitted)).

Indeed, one of the six statutory factors informing the inquiry as to whether the allegedly diluting mark "impairs the distinctiveness of the famous mark" is "[t]he degree of similarity between the mark or trade name and the famous mark." 15 U.S.C. § 1125(c)(2)(B)(i) (emphasis added). Consideration of a "degree" of similarity as a factor in determining the likelihood of

11

dilution does not lend itself to a requirement that the similarity between the subject marks must be "substantial" for a dilution claim to succeed. See Bonime, 547 F.3d at 502. Moreover, were we to adhere to a substantial similarity requirement for all dilution by blurring claims, the significance of the remaining five factors would be materially diminished because they would have no relevance unless the degree of similarity between the marks are initially determined to be "substantial." Such requirement of substantial similarity is at odds with the federal dilution statute, which lists "degree of similarity" as one of several factors in determining blurring. See United States v. Kozeny, 541 F.3d 166, 171 (2d Cir. 2008) ("Statutory enactments should . . . be read so as to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)); compare 15 U.S.C. § 1125(c)(2)(B)(ii) (providing "[t]he degree of inherent or acquired distinctiveness of the famous mark" as one of the factors to be considered in determining dilution), with Perfumebay.com Inc. v. Ebay, Inc., 506 F.3d 1165, 1180, 1181 n.9 (9th Cir. 2007) (comparing post-TDRA federal dilution law with California's dilution law and noting that "the similarity requirement [in a dilution action] may be less stringent in circumstances in which the senior marks is highly distinctive and the junior mark is being used for a closely related product." (internal quotation marks omitted)).[4] Accordingly, the District Court erred to the extent it focused on the absence of "substantial similarity" between the Charbucks Marks and the Starbucks Marks to dispose of Starbucks' dilution claim. We note that the court's error likely affected its view of the importance of the other factors in analyzing the blurring claim, which must ultimately focus on whether an association, arising from the similarity between the subject marks, "impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B); cf. Perfumebay.com, Inc., 506 F.3d at 1180-81; see supra note 4.

---

[4] Despite the Ninth Circuit's relaxing of the similarity standard where the famous mark is highly distinctive, the court nonetheless required that the subject marks be "essentially the same" for a dilution claim to succeed under California law. See Perfumebay.com Inc., 506 F.3d at 1181 (stating that "eBay" is so highly distinctive that consumers likely will view a junior mark "that is a bit different," such as "Perfumebay," as "essentially the same" as "eBay" (internal quotation marks omitted)). The Ninth Circuit has not resolved whether this "essentially the same" standard also applies to federal dilution claims post-TDRA.

12

Turning to the remaining two disputed factors — (1) whether the user of the mark intended to create an association with the famous mark, and (2) whether there is evidence of any actual association between the mark and the famous mark — we conclude that the District Court also erred in considering these factors.

The District Court determined that Black Bear possessed the requisite intent to associate Charbucks with Starbucks but that this factor did not weigh in favor of Starbucks because Black Bear did not act in "bad faith." The determination of an "intent to associate," however, does not require the additional consideration of whether bad faith corresponded with that intent. The plain language of section 1125(c) requires only the consideration of "[w]hether the user of the mark or trade name intended to create an association with the famous mark." See 15 U.S.C. § 1125(c)(2)(B)(v); see also Kozeny, 541 F.3d at 171 ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (internal quotation marks omitted)). Thus, where, as here, the allegedly diluting mark was created with an intent to associate with the famous mark, this factor favors a finding of a likelihood of dilution.

The District Court also determined that there was not an "actual association" favoring Starbucks in the dilution analysis. Starbucks, however, submitted the results of a telephone survey where 3.1% of 600 consumers responded that Starbucks was the possible source of Charbucks. The survey also showed that 30.5% of consumers responded "Starbucks" to the question: "[w]hat is the first thing that comes to mind when you hear the name 'Charbucks.'" In rejecting Starbucks' claim of actual association, the District Court referred to evidence supporting the absence of "actual confusion" to conclude that "the evidence is insufficient to make the . . . factor weigh in [Starbucks'] favor to any significant degree." (internal quotation marks and original alteration omitted). This was error, as the absence of actual or even of a likelihood of confusion does not undermine evidence of trademark dilution. See 15 U.S.C. § 1125(c)(2)(B); accord Nabisco, 191 F.3d at 221 (stating that while a showing of consumer

13

confusion is relevant in determining dilution by blurring, the absence of confusion "has no probative value" in the dilution analysis).

Accordingly, in light of the foregoing, we remand to the District Court for consideration of Starbucks' claim of trademark dilution by blurring under 15 U.S.C. § 1125(c)(2)(B).

2.     Dilution by Tarnishment

Dilution by tarnishment is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). "A trademark may be tarnished when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 507 (2d Cir. 1996) (internal quotation marks omitted). A trademark may also be diluted by tarnishment if the mark loses its ability to serve as a "wholesome identifier" of plaintiff's product. Id.; accord Chemical Corp. v. Anheuser-Busch, Inc., 306 F.2d 433 (5th Cir. 1962) (finding that use of exterminator's slogan "where there's life, . . . there's Bugs" tarnished the use of beer company's slogan "where there's life, . . . there's Bud."); Steinway & Sons v. Robert Demars & Friends, 210 U.S.P.Q. 954 (C.D. Cal. 1981) (finding that use of "STEIN-WAY CO." to sell clip-on beverage handles tarnished high-end musical instrument company's use of its name of "STEINWAY & SONS"); Eastman Kodak Co. v. Rakow, 739 F. Supp. 116 (W.D.N.Y. 1989) (finding that comedian's stage name "Kodak" tarnished the mark of the Eastman Kodak Company because the comedian's act "includes humor that relates to bodily functions and sex . . . and . . . uses crude, off-color language repeatedly" (internal quotation marks omitted)); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 467 F. Supp. 366 (S.D.N.Y.) (finding that pornographic depiction of a Dallas Cowboys Cheerleader-style cheerleader in an adult film tarnished the professional mark of the Dallas Cowboys Cheerleaders), aff'd, 604 F.2d 200 (2d Cir. 1979).

14

Starbucks argues that the District Court "erred by failing to find that 'Charbucks' damages the positive reputation of Starbucks by evoking both 'Starbucks' and negative impressions in consumers, including the image of bitter, over-roasted coffee." Starbucks reasons that it has shown dilution by tarnishment because, pursuant to its survey, (1) 30.5% of persons surveyed "immediately associated 'Charbucks' with 'Starbucks'"; and (2) 62% of those surveyed who associated "Charbucks" with "Starbucks" "indicated that they would have a negative impression" of a "coffee named 'Charbucks.'" We are unpersuaded by Starbucks' reasoning.

To the extent Starbucks relies on the survey, a mere association between "Charbucks" and "Starbucks," coupled with a negative impression of the name "Charbucks," is insufficient to establish a likelihood of dilution by tarnishment. That a consumer may associate a negative-sounding junior mark with a famous mark says little of whether the consumer views the junior mark as harming the reputation of the famous mark. The more relevant question, for purposes of tarnishment, would have been how a hypothetical coffee named either "Mister Charbucks" or "Charbucks Blend" would affect the positive impressions about the coffee sold by Starbucks. We will not assume that a purportedly negative-sounding junior mark will likely harm the reputation of the famous mark by mere association when the survey conducted by the party claiming dilution could have easily enlightened us on the matter. Indeed, it may even have been that "Charbucks" would strengthen the positive impressions of Starbucks because it brings to the attention of consumers that the "Char" is absent in "Star"bucks, and, therefore, of the two "bucks," Starbucks is the "un-charred" and more appealing product. Juxtaposition may bring to light more appealing aspects of a name that otherwise would not have been brought to the attention of ordinary observers.

Starbucks also argues that "Charbucks" is a pejorative term for Starbucks' coffee, and, therefore, the Charbucks "name has negative associations that consumers are likely to associate with Starbucks' coffee." Although the term "Charbucks" was once used pejoratively during the

15

so-called "coffee-wars"[5] in Boston, Massachusetts, Black Bear is not propagating that negative meaning but, rather, is redefining "Charbucks" to promote a positive image for its brand of coffee. Black Bear sells "Charbucks" as its own product, and, consistent with its intent on profiting from selling Charbucks, the Charbucks line of coffee is of "[v]ery high quality. It's our life. We put everything into it." In short, Black Bear is promoting "Charbucks" and not referring to it in a way as to harm the reputation of Starbucks' coffees. Cf. Deere & Co., 41 F.3d at 45 (stating that the likelihood of dilution by tarnishment means "the possibility that consumers will come to attribute unfavorable characteristics to a mark and ultimately associate the mark with inferior goods and services").

Moreover, that the Charbucks line of coffee is marketed as a product of "[v]ery high quality" — as Starbucks also purports its coffee to be — is inconsistent with the concept of "tarnishment." See Hormel Foods Corp., 73 F.3d at 507 (citing cases finding tarnishment where challenged marks were either "seamy" or substantially of lesser quality than the famous mark). Certainly, the similarity between Charbucks and Starbucks in that they are both "[v]ery high quality" coffees may be relevant in determining dilution, see 15 U.S.C. 1125(c)(2)(B), (c)(2)(C), but such similarity in this case undercuts the claim that Charbucks harms the reputation of Starbucks. See Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994) ("'Tarnishment' generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product."). Accordingly, we conclude that the District Court did not err in rejecting Starbucks' claim of dilution by tarnishment.

### 3. The Parody Exception

Even if its use of "Charbucks" constituted dilution by either blurring or tarnishment, Black Bear appears to argue in the alternative that Charbucks is a parody and thus falls under an

---

[5] The name "Charbucks" was used publicly by the owner of a former chain of coffee bars, "Coffee Connection," to describe what the owner believed was the "over-roasted" type of coffee Starbucks was serving.

exception to 15 U.S.C. § 1125(c). Section 1125(c)(3), which was added in 2006 pursuant to the TDRA, specifies that the following uses of a mark "shall not be actionable as dilution by blurring or dilution by tarnishment":

(A)     Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person <u>other than as a designation of source for the person's own goods or services</u>, including use in connection with —
    (i)     advertising or promotion that permits consumers to compare goods or services; or
    (ii)    <u>identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.</u>
(B)     All forms of news reporting and news commentary.
(C)     Any noncommercial use of a mark.

15 U.S.C. § 1125(c)(3) (emphasis added).

As evident from the statutory language, Black Bear's use of the Charbucks Marks cannot qualify under the parody exception because the Charbucks Marks are used "as a designation of source for [Black Bear's] own goods[, <u>i.e.</u>, the Charbucks line of coffee]." <u>See</u> 15 U.S.C. § 1125(c)(3)(A). Although Black Bear cites to several cases in support of its argument that the parody exception may still apply even if the parody were used to "identify the source of the defendants' goods," those cases were decided before the TDRA and are thus inapposite to the extent they are inconsistent with the amended section 1125(c)(3). <u>See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC</u>, 507 F.3d 252, 266 (4th Cir. 2007).

Inasmuch as Black Bear's argument may be construed as advocating for consideration of parody in determining the likelihood of dilution by blurring — such as is recognized by the Fourth Circuit, <u>see id.</u> at 267 — we need not adopt or reject <u>Louis Vuitton</u>'s parody holding. We conclude that Black Bear's use of the Charbucks Marks is not a parody of the kind which would favor Black Bear in the dilution analysis even if we were to adopt the Fourth Circuit's rule.

In the Fourth Circuit's <u>Louis Vuitton</u> case, Louis Vuitton Malletier S.A. — the famous maker of luxury luggage, handbags, and accessories — asserted, <u>inter alia</u>, a trademark dilution claim against Haute Diggity Dog, LLC, a manufacturer of pet toys that named its products to

17

"parody elegant high-end brands of products such as perfume, cars, shoes, sparkling wine, and handbags." Id. at 256, 258. Among its parodies, Haute Diggity Dog, LLC's "Chewy Vuiton" product was alleged by Louis Vuitton Malletier S.A. as infringing and dilutive of the "Louis Vuitton" mark. Id. at 256.

Addressing the dilution claim, the Fourth Circuit initially noted that the fair use exception for parodies as specified in 15 U.S.C. § 1125(c)(3)(A) "does not extend . . . to parodies used as a trademark. . . . [P]arodying a famous mark is protected by the fair use defense only if the parody is not 'a designation of source for the person's own goods or services.'" Louis Vuitton, 507 F.3d at 266. The Fourth Circuit then held, however, that the defendant's use of a parody "may [still] be considered in determining whether the plaintiff-owner of a famous mark has proved its claim that the defendant's use of a parody mark is likely to impair the distinctiveness of the famous mark[, i.e., whether the plaintiff has proved a likelihood of dilution by blurring under 15 U.S.C. § 1125(c)(2)(B)]." Id. at 267. In justifying its consideration of a parody element in conducting the blurring analysis under section 1125(c)(2)(B), the Fourth Circuit explained:

> [F]actor (v) (whether the defendant intended to create an association with the famous mark) and factor (vi) (whether there exists an actual association between the defendant's mark and the famous mark) directly invite inquiries into the defendant's intent in using the parody, the defendant's actual use of the parody, and the effect that its use has on the famous mark. While a parody intentionally creates an association with the famous mark in order to be a parody, it also intentionally communicates, if it is successful, that it is not the famous mark, but rather a satire of the famous mark. That the defendant is using its mark as a parody is therefore relevant in the consideration of these statutory factors.

> Similarly, factors (i), (ii), and (iv) — the degree of similarity between the two marks, the degree of distinctiveness of the famous mark, and its recognizability — are directly implicated by consideration of the fact that the defendant's mark is a successful parody. Indeed, by making the famous mark an object of the parody, a successful parody might actually enhance the famous mark's distinctiveness by making it an icon. The brunt of the joke becomes yet more famous.

Id. (internal citations omitted). The Fourth Circuit then concluded that "Chewy Vuiton" did not dilute "Louis Vuitton" primarily because Chewy Vuiton "convey[ed] the . . . message that it was not in fact a source of [Louis Vuitton] products. . . . [A]s a parody, it separated itself from the [Louis Vuitton] marks in order to make fun of them." Id. at 267-68 ("[B]ecause [Louis

18

Vuitton's] mark is particularly strong and distinctive, it becomes more likely that a [successful] parody will not impair the distinctiveness of the mark.").

Here, unlike in Louis Vuitton, Black Bear's use of the Charbucks Marks is, at most, a subtle satire of the Starbucks Marks. Although we recognize some humor in "Char"bucks as a reference to the dark roast of the Starbucks coffees, Black Bear's claim of humor fails to demonstrate such a clear parody as to qualify under the Fourth Circuit's rule. As the owner of Black Bear affirmed during his testimony, "[t]he inspiration for the term Charbucks comes directly from Starbucks' tendency to roast its products more darkly than that of other major roasters." The owner of Black Bear further testified that the Charbucks line of products "is the darkest roasted coffee that we do" and is of "[v]ery high quality." Thus, the Charbucks parody is promoted not as a satire or irreverent commentary of Starbucks but, rather, as a beacon to identify Charbucks as a coffee that competes at the same level and quality as Starbucks in producing dark-roasted coffees. See Harley Davidson, Inc. v. Grottanelli, 164 F.3d 806, 813 (2d Cir. 1999) ("[P]arodic use is sharply limited" in circumstances where "an alleged parody of a competitor's mark [is used] to sell a competing product."); cf. Louis Vuitton, 507 F.3d at 260-61 (permitting parodic use where the parody marketed its products to a significantly different class of consumers than the famous mark); id. ("The [Louis Vuitton] handbag is provided for the most elegant and well-to-do celebrity, to proudly display to the public and the press, whereas the imitation 'Chewy Vuiton' 'handbag' is designed to mock the celebrity and be used by a dog.").

Therefore, because the Charbucks Marks do not effect an "increase [in] public identification [of the Starbucks Marks with Starbucks]," the purported Charbucks parody plays no part in undermining a finding of dilution under the Fourth Circuit's rule. See generally Hormel Foods Corp., 73 F.3d at 506; Louis Vuitton, 507 F.3d at 260 ("[A] parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect." (internal quotation marks omitted)). Accordingly, we conclude that Black Bear's incantation of parody does nothing to shield it from Starbucks' dilution claim in this case.

19

C.      State Trademark Dilution

New York law provides that a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y. Gen. Bus. Law § 360-*l*. Similar to federal trademark dilution law under 15 U.S.C. § 1125(c), section 360-*l* has been interpreted to provide for protection against both dilution by blurring and tarnishment. See Hormel Foods Corp., 73 F.3d at 506-07. Unlike federal trademark dilution law, however, New York's trademark dilution law does not require a mark to be "famous" for protection against dilution to apply. Compare 15 U.S.C. § 1125(c), with N.Y. Gen. Bus. Law § 360-*l*. Nor are the factors that are considered for determining dilution by blurring under New York law coextensive with the factors for determining dilution by blurring under federal law. Compare New York Stock Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 558 (2d Cir. 2002) ("To determine the likelihood of blurring, we have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark."), with 15 U.S.C. § 1125(c)(2)(B)(i)-(vi). Most important to the distinction here, New York law does not permit a dilution claim unless the marks are "substantially" similar. See Playtex Prods., Inc., 390 F.3d at 167 ("A plaintiff cannot prevail on a [New York] state or [pre-TDRA] federal dilution claim unless the marks at issue are 'very' or 'substantially similar.'").

Because we conclude that the District Court did not clearly err in finding that the Charbucks Marks are not substantially similar to the Starbucks Marks, the court did not err in denying Starbucks relief under New York dilution law. Moreover, for the reasons stated supra, Part II(B)(2) (Dilution by Tarnishment), we agree with the District Court that Starbucks failed to establish dilution by tarnishment under New York law. Accordingly, we hold that the District Court did not err in finding that there was no likelihood of dilution under New York law in this

20

case.

D.      Trademark Infringement and Unfair Competition Claims

To prevail on a trademark infringement and unfair competition claim under 15 U.S.C. §§ 1114(1), 1125(a), in addition to demonstrating that the plaintiff's mark is protected, the plaintiff must prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods. Savin Corp., 391 F.3d at 456 ("The crucial issue in an action for trademark infringement . . . is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." (internal quotation marks omitted)); Star Indus., Inc., 412 F.3d at 384 ("In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." (quoting Dallas Cowboys Cheerleaders, 604 F.2d at 204-05 (internal quotation marks omitted))).[6]

In determining whether there is a likelihood of confusion, we apply the eight-factor balancing test introduced in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961). The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market. Star Indus., 412 F.3d at 384. The application of the Polaroid test is "not

---

[6] To the extent Starbucks argues that the District Court applied an excessively narrow view of "likelihood of confusion" by requiring that consumers "are likely to believe the infringer's goods originate from the trademark owner," we reject this argument as unsupported by the record. The District Court explicitly concluded that Starbucks was "unable to prove the requisite likelihood of consumer confusion as to source, sponsorship, or association of [Charbucks] with the Starbucks mark." (emphasis added).

21

mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." Id.; see also id. at 383 ("[A] plaintiff must prove . . . a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers" in order to establish a likelihood of confusion) (internal quotation marks omitted)); Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993).

Here, that the Starbucks Marks are strong ones (first factor), that the parties use their respective marks in connection with the sale of coffee products (third factor), and that there is no competitive gap to be bridged between the relevant commercial activities of the parties (fourth factor) are not disputed. Whether these factors should favor Starbucks, however, is contested to some extent by Black Bear. Specifically, although Black Bear accepts that the third factor favors Starbucks in determining the likelihood of confusion, Black Bear argues that the first and fourth factors do not favor Starbucks in the determination of a likelihood of confusion.[7]

We agree with Black Bear's first argument that the "bridging the gap" factor is irrelevant and thus should not favor Starbucks where, as here, the two products are in direct competition with each other. Star Indus., 412 F.3d at 387 (explaining that when products are in direct competition, "there is really no gap to bridge, and [the bridging] factor is irrelevant to the Polaroid analysis"). Thus, in this respect, we find error in the District Court's Polaroid analysis. Of course, we hasten to add that this error was inconsequential because the District Court ultimately concluded that it was not likely that Charbucks would be confused with Starbucks.

We reject Black Bear's second argument, however, that the particularly strong Starbucks Marks should "weigh . . . against the likelihood of confusion." In so arguing, Black Bear ignores the rule that a strong mark "would be a factor favoring the trademark plaintiff." Hormel Foods

_____

[7] The District Court's opinion initially noted that the strength of the plaintiff's mark, direct competitiveness, and bridge-the-gap factors "weigh in favor of Starbucks" but then later concluded that "[o]ther than the strength of the mark, the Polaroid factors in the instant case are largely favorable to [Black Bear] or neutral." We understand the District Court's reference to "largely . . . neutral" as an alternative method of expressing that the factors that weigh in favor of Starbucks do so only slightly.

Corp., 73 F.3d at 503 (emphasis added); id. ("The more deeply a plaintiff's mark is embedded in the consumer's mind, the more likely it is that the defendant's mark will conjure up the image of the plaintiff's product instead of that of the junior user."); see also, e.g., Playtex Prods., Inc., 390 F.3d at 164. To be sure, we have held that a strong mark may nonetheless weigh against the likelihood of confusion in the limited circumstance where the defendants' mark is a clear parody and there is widespread familiarity with the parody. See Hormel Foods Corp., 73 F.3d at 503. But Black Bear's "Charbucks" is, at most, familiar only to the New England region and some consumers on the internet. Cf. id. (finding against the owners of the SPAM mark in infringement action because the "use of the name 'Spa'am' is simply another in a long line of Muppet lampoons. . . . [T]his Muppet brand of humor is widely recognized and enjoyed"). More importantly, Charbucks is not a "clear parody" as Black Bear urges because the purported parody designates a product that is in direct competition with the products identified with the Starbucks Marks. See supra Part II(B)(3) (The Parody Exception); White v. Samsung Elecs. Am., Inc., 971 F.2d 1395, 1401 (9th Cir. 1992) ("The difference between a 'parody' and a 'knock-off' is the difference between fun and profit."); cf. Deere & Co., 41 F.3d at 45 (noting that parodies may offer no excuse to claims of trademark dilution when "the object of the joke is the mark of a directly competing product"); id. ("The line-drawing in this area becomes especially difficult when a mark is parodied for the dual purposes of making a satiric comment and selling a somewhat competing product."). Accordingly, we find no error in the District Court's consideration of the strength of the Starbucks Marks to favor Starbucks in the Polaroid analysis.

With respect to the remaining five Polaroid factors, namely, (1) similarity of the marks; (2) evidence of actual consumer confusion; (3) evidence that the imitative mark was adopted in bad faith; (4) respective quality of the products; and (5) sophistication of consumers in the relevant market; we find no error in the District Court's determinations as to each individual factor — with the exception of (5) — and agree that, ultimately, there is no likelihood that consumers will confuse the Charbucks Marks with the Starbucks Marks.

23

Starbucks' argument that the District Court clearly erred in finding that the Charbucks Marks and the Starbucks Marks were minimally similar is rejected for the same reasons discussed supra Part II(B)(1) (Dilution by Blurring).  Starbucks further argues in its challenge to the District Court's Polaroid analysis that the court clearly erred because it "presuppose[d] that no consumer who searches for 'Charbucks' on the Internet, either purposefully or as the result of a typing error, is without perfect information about the true source, affiliation or sponsorship of the product."  The District Court, however, considered the similarity between the Charbucks Marks with the Starbucks Marks in the context in which each were presented to the public and did not presuppose perfect knowledge by the consumer:

> It is possible, by using a search engine, to reach a page within [Black Bear's] Internet web site that lists "Mr. Charbucks Blend" for sale along with other types of Black Bear coffee and that does not show the Black Bear logo or company name as such.  The internet address for this page does, however, include the "blackbearcoffee.com" domain name utilized by [Black Bear].  This page of the web site is not indicative of stand-alone or other potentially confusing use by [Black Bear] of the word "Charbucks" in promoting its products.

See Star Indus., 412 F.3d at 386; cf. Savin, 391 F.3d at 458 (noting that stylistic differences between marks may be of less significance on the internet, where marks are shown as "text-based").  Given the prominence of "Black Bear" on the Charbucks products and the conspicuous differences between the Charbucks Marks and the Starbucks Marks as they are presented to the public, it was not clearly erroneous for the District Court to find that the two were only minimally similar.  See supra Part II(B)(1) (Dilution by Blurring).

Starbucks next argues that the District Court clearly erred in finding that evidence of actual confusion — or the court's finding of a lack thereof — favored Black Bear in the Polaroid analysis.  The only evidence as to actual confusion submitted by Starbucks was a telephone survey where 3.1% of 600 respondents named Starbucks as a possible source of a "Charbucks" product; 30.5% of 600 respondents "immediately thought of 'Starbucks'" upon hearing "Charbucks"; and 9% of consumers "immediately thought of coffee . . . after hearing 'Charbucks.'"  Particularly in light of the fact that the survey was administered by telephone and

24

did not present the term "Charbucks" in the context in which Black Bear used it, the District Court did not clearly err in finding that the survey was "insufficient to make the actual confusion factor weigh in [Starbucks'] favor to any significant degree." Moreover, Starbucks' own witness, a Director of Brand Management, testified that Starbucks had no knowledge that any consumer had ever actually become confused that Charbucks was a Starbucks product. Although actual confusion is not necessary to establish a likelihood of confusion, Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 78 (2d Cir. 1988), as Black Bear observes, "[t]he co-existence of the Starbucks mark and 'Charbucks Blend' and 'Mr. Charbucks' marks for eleven years with no report of a single customer becoming confused is a 'powerful indication' that there is no confusion or likelihood of confusion,"[8] see id. (stating that a lack of evidence showing actual confusion "may under some circumstances be used against a plaintiff").

Starbucks also argues that the District Court erred in considering whether Charbucks was adopted by Black Bear in bad faith to mislead the public. Starbucks argues that the District Court applied the wrong legal standard because "Black Bear's intent to capitalize on Starbucks' reputation is undisputed and its alleged lack of intent to mislead is irrelevant to the 'intent' factor." We reject Starbucks' argument, however, because the "only relevant intent is intent to confuse. There is a considerable difference between an intent to copy and an intent to deceive." 4 McCarthy on Trademarks § 23.113; see also Star Indus., 412 F.3d at 388 ("Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies'

_____

[8] To the extent Starbucks claims that the relatively minimal sales of Black Bear's coffee since 1997 gave "little opportunity for consumers to become confused," this argument is unavailing. Since 1997, Charbucks has sold $7,000 annually of the Charbucks line of coffee, which range in price from $4.30 to $35.80 per bag. Moreover, Black Bear sold its Charbucks coffee openly in certain supermarkets in New England and through the internet, thus giving consumers more than a "little opportunity" for them to observe both the Charbucks Marks and the Starbucks Marks in the stream of commerce. Cf. Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 869 (2d Cir. 1986) (relying on "minimal sales" over a period of approximately seven years — U.S. customs having prohibited for several of those years the importation of the allegedly infringing products — to conclude that it was unfair to draw an inference that confusion was unlikely).

25

products."). Although deliberate copying may indicate that the defendant acted in bad faith, Paddington Corp. v. Attiki Importers & Distributors, Inc., 996 F.2d 577, 587 (2d Cir. 1993), the District Court is not required to draw that inference where there is evidence to the contrary.

Here, Black Bear wrote in 1997 that the "Char" part of "Charbucks" would prevent anyone from purchasing the dark roasted coffee by mistake and that "[s]ince the name was going on our packaging, and since our graphics bore no similarity whatsoever to Starbuck's [sic] graphics, it seemed perfectly obvious that no one could possibly be confused into thinking we were in any way connected to Starbucks." Indeed, presumably because of its small operation and its local customers' disdain for large corporations, Black Bear's owner testified that Black Bear's association with a "large corporation . . . would be very bad for us." Thus, the District Court reasonably concluded that Black Bear did not intend to mislead the public that the Charbucks coffees were Starbucks products, and, accordingly, the court did not clearly err in its consideration of the "bad faith" factor.

Starbucks also challenges the District Court's consideration of the "comparability of goods" factor. Instead of challenging the District Court's factual determination that both Starbucks and the Charbucks line of products were high quality coffees, Starbucks argues that the court's conclusion that the goods were of comparable quality should favor Starbucks in the analysis of "likelihood of confusion." In support of this argument, Starbucks cites to Morningside Group Ltd. v. Morningside Cap. Group, LLC, 182 F.3d 133, 142 (2d Cir. 1999); however, that case concluded that when goods or services of equal quality compete, the quality factor "cuts both ways." Id. at 143. Thus, Starbucks' argument that the factor must only favor it is unsupported by the law.[9]

---

[9] In Morningside, this Court stated that under the quality factor, "a court first examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." Morningside, 182 F.3d at 142. It then observed that products of equal quality would not render the plaintiff's product inferior or otherwise tarnish the plaintiff's product's reputation. Id. It also observed that products of equal quality would make it more likely that confusion would occur. Id. It thus concluded that the quality factor "cuts both ways." Id. This Court did not explain, however, why it need examine "whether defendant's

26

Finally, Starbucks argues that the District Court clearly erred in finding that the "ordinary purchaser is very unlikely to mistake [Black Bear's] 'Mr. Charbucks Blend' or 'Charbucks Blend' product for one offered by Starbucks, whether or not that person is 'highly discriminating,'" and consequently concluding that the consumer sophistication factor favored Black Bear. Starbucks argues that its base of coffee customers are not sophisticated enough to discriminate between the Charbucks Marks and the Starbucks Marks "because consumers generally make quick, casual purchasing decisions about low-cost goods and therefore are more likely to form mistaken impressions about the products' affiliation or sponsorship."

The District Court's determination that purchasers were unlikely to be mistaken whether or not they were sophisticated does not logically support its conclusion that consumer sophistication, as an individual factor, favored Black Bear. The District Court appears to have been anticipating its final balancing of the Polaroid factors within its consumer sophistication analysis. Moreover, Starbucks is correct that our case law has associated the purchase of low-cost goods in a supermarket environment with low customer sophistication. See, e.g., Lever Bros. Co. v. Am. Bakeries Co., 693 F.2d 251, 259 (2d Cir. 1982). But "price alone is not determinative of the care a consumer will take in making purchases, and our touchstone remains the general impression that is left with the ordinary consumer." The Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 965 (2d Cir. 1996). Given the lack of evidence provided to the District Court regarding consumer sophistication, we decline to give this factor "much, if any, weight" in our de novo balancing of the Polaroid factors. See Hasbro, Inc. v. Lunard Toys, Ltd., 858 F.2d 70, 78-79 (2d Cir. 1988).

In sum, considering all of the Polaroid factors, we conclude that there is no "likelihood of

---

products or services are inferior" to determine simply the "likelihood of confusion." We need not resolve the question in this appeal, however, because there is no likelihood of confusion even if this factor were to favor Starbucks only. See Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 538 (2d Cir. 2005) ("[D]istrict courts must be careful to maintain a focus on the ultimate issue of the likelihood of consumer confusion.").

confusion" in this case. Notably, the District Court — in coming to the same conclusion we reach here — considered the fourth <u>Polaroid</u> factor ("bridge the gap" factor) in favor of Starbucks. Having concluded that the "bridge the gap" factor should not have weighed in favor of Starbucks in the <u>Polaroid</u> analysis, we <u>a fortiori</u> agree with the District Court's ultimate conclusion that there is no likelihood of confusion "as to source, sponsorship, or association of [Charbucks] with the Starbucks mark," notwithstanding our determination that the consumer sophistication factor should not have been given much weight in the analysis.

## III.   CONCLUSION

For the foregoing reasons, the judgment of the District Court is AFFIRMED in part and VACATED in part. The case is REMANDED to the District Court for further proceedings consistent with this opinion.