THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                    Mailed:
October 14, 2009                            February 16, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Citigroup Inc.
v.
Capital City Bank Group, Inc.

_____

Opposition No. 91177415
to application Serial No. 78906010
filed on June 12, 2006

to application Serial No. 78909113
filed on June 15, 2006

to application Serial No. 78930103
filed on July 14, 2006

to application Serial No. 78934941
filed on July 21, 2006

_____

Kenneth A. Plevan of Skadden, Arps, Slate, Meagher & Flom
LLP for Citigroup Inc.

Joseph W. Berenato of Berenato, White & Stavish, LLC for
Capital City Bank Group, Inc.

_____

Before Hairston, Rogers and Bergsman, Administrative
Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Capital City Bank Group, Inc. ("applicant") filed the

following applications:

1. A use-based application on the Principal Register for the mark CAPITAL CITY BANK, in standard character form, for the following services:

> Banking services; credit and cash card services; electronic payment, namely, electronic processing and transmission of bill payment data; brokerage and administration services in the field of securities, namely, mutual funds, stocks and bonds, annuities, tax advantaged securities, money market funds, self directed retirement accounts, including IRA portfolio management, 401(k) portfolio management, simply (sic) IRA and Roth portfolio management; brokerage of life insurance and long term care insurance; mortgage banking services, namely, origination, acquisition, servicing, securitization and brokerage of mortgage loans; home equity loans; financing services; commercial and consumer lending services; financial information provided by electronic means; real estate and mortgage brokerage services; estate trust management; estate planning; administration of employee pension plans; administration services in the field of banking, namely, correspondent services, data process, and account servicing, in Class 36.[1]

2. An intent-to-use application on the Principal Register for the mark CAPITAL CITY BANK INVESTMENTS, in standard character form, for the following services:

> Brokerage and administration services in the fields of securities, namely, mutual funds, stocks and bonds, annuities, tax advantaged securities, money market

---

[1] Serial No. 78906010, filed June 12, 2006. Applicant claimed January 1, 1996 as its date of first use of the mark anywhere and January 1, 2006 as its date of first use of the mark in commerce. Applicant disclaimed the exclusive right to use the word "Bank."

        funds, and self directed retirement accounts, including IRA portfolio management, 401(k) portfolio management, Simple IRA, and Roth IRA portfolio management; brokerage of life insurance and long-term care insurance, in Class 36.[2]

3.    An intent-to-use application on the Principal Register for the mark CAPITAL CITY BANK GROWING BUSINESS, in standard character form, for "banking services; online banking services," in Class 36.[3]

4.    An intent-to-use application on the Principal Register for the mark CAPITAL CITY BANC INVESTMENTS, in standard character form, for the following services:

        Brokerage and administration services in the fields of securities, namely, mutual funds, stocks and bonds, annuities, tax advantaged securities, money market funds, and self directed retirement accounts, including IRA portfolio management, 401(k) portfolio management, Simple IRA, and Roth IRA portfolio management; brokerage of life insurance and long-term care insurance, in Class 36.[4]

In each application, applicant claimed ownership of the three registrations set forth below for banking services in Class 36:

---

[2] Serial No. 78909113, filed June 15, 2006. Applicant disclaimed the exclusive right to use the words "Bank Investments."
[3] Serial No. 78930103, filed July 14, 2006. Applicant disclaimed the exclusive right to use the word "Bank."
[4] Serial No. 78934941, filed July 21, 2006. Applicant disclaimed the exclusive right to use the words "Banc Investments."

1.    Registration No. 2007889 for the mark CAPITAL CITY BANK and design, shown below.[5]



2.    Registration No. 2165466 for the mark CAPITAL CITY BANK and design, shown below.[6]



3.    Registration No. 2283071 for the mark CAPITAL CITY BANK ATM and design, shown below.[7]



---

[5] Issued October 15, 1996; Sections 8 and 15 affidavits accepted and acknowledged; renewed.
[6] Issued June 16, 1998; Sections 8 and 15 affidavits accepted and acknowledged; renewed.  The drawing of the mark is lined for the colors red and blue.
[7] Issued October 5, 1999; Sections 8 and 15 affidavits accepted and acknowledged; renewed.

Opposition No. 91177415

Citigroup Inc. ("opposer") filed a notice of opposition against the registration of applicant's marks on the ground of priority of use and likelihood of confusion pursuant to Section 2(d) of the Trademark Act of 1946, 15 U.S.C. § 1052(d), and dilution pursuant to Section 43(c) of the Trademark Act of 1946, 15 U.S.C. § 1125(c). Opposer alleged that it is the owner of a famous family of CITIBANK service marks for financial services, that opposer has registered numerous CITIBANK marks, and that applicant's marks so resemble opposer's CITIBANK marks that applicant's marks are likely to cause confusion with opposer's marks and to dilute the distinctiveness of the CITIBANK marks. Opposer specifically alleged ownership of the following registrations:

1.  Registration No. 0691815 for the mark CITIBANK, in typed drawing form, for "banking services," in Class 36;[8]

2.  Registration No. 1016844 for the mark CITIBANK, in typed drawing form, for "periodical publications for inhouse (sic) and public distribution concerning matters of interest to employees, bankers, and to customers," in Class 16;[9]

3.  Registration No. 2402872 for the mark CITIBANK EVERYTHING THAT COUNTS, in typed drawing form, for

---

[8] Issued January 19, 1960; Sections 8 and 15 affidavits accepted and acknowledged; second renewal.
[9] Issued July 29, 1975; Sections 8 and 15 affidavits accepted and acknowledged; second renewal.

5

"financial services, namely, banking services," in Class 36;[10]

4. Registration No. 2512302 for the mark CITIBANK FAMILYTECH, in typed drawing form, for "charitable services, namely, a program providing computers and computer skills to students, families and teachers," in Class 42;[11] and,

5. Registration No. 3230656 for the mark CITIBANK CLEAR CARD, in standard character form, for "promoting the goods and services of others through credit card customer incentive, loyalty and reward programs," in Class 35.[12]

Applicant, in its answer, denied all of the allegations in the notice of opposition and asserted laches as an affirmative defense.

The opposition was fully briefed and an oral hearing was held on October 14, 2009.

Preliminary Issue

Opposer alleged that "[t]he CITIBANK Marks became famous prior to the date Applicant filed the applications." (Notice of Opposition ¶10). Paragraph No. 10 is sufficient to state a dilution claim against the intent-to-use applications. However, it does not properly state a dilution claim against applicant's use-based application

---

[10] Issued November 7, 2000; Sections 8 and 15 affidavits accepted and acknowledged.
[11] Issued November 21, 2001; Sections 8 and 15 affidavits accepted and acknowledged.
[12] Issued April 17, 2007.

6

because opposer did not allege that the "CITIBANK Marks" became famous prior to applicant's use of the mark CAPITAL CITY BANK. *Toro Co. v. ToroHead Inc.,* 561 USPQ2d 1164, 1174 n.9 (TTAB 2001) ("In a use-based application under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), the party alleging fame must show that the mark had become famous prior to the applicant's use of the mark"). Section 43(c)(1) provides that "the owner of a famous mark … shall be entitled to an injunction against another who, **at any time after the owner's mark has become famous, commences use of a mark** or trade name in commerce that is likely to cause dilution." (Emphasis added). Because a date of first use alleged in an application is subject to proof, a plaintiff claiming dilution need not necessarily allege acquisition of fame prior to the particular use date asserted in a use-based application, but must allege acquisition of fame prior to "the applicant's use of the mark," whenever that use may be shown, at trial, to have occurred. In any event, because applicant did not move to strike the dilution claim for failure to state a claim and, in its brief, treated the dilution claim as if it were properly pleaded, we deem the dilution claim against the use-based application to have been properly pleaded. In other words, we deem the dilution claim to allege that opposer's "CITIBANK Marks" became

famous prior to applicant's use of the mark CAPITAL CITY BANK.

The technical distinction noted above between the requirements for pleading dilution against use-based and intent-to-use applications is, however, inconsequential in this case, where the record shows that applicant began using CAPITAL CITY BANK prior to the filing date of the intent-to-use applications. Opposer's dilution claim relates to applicant's use of the CAPITAL CITY BANK per se, and as a portion of the various other applied-for marks. Therefore, opposer must show that its marks became famous prior to applicant's use of CAPITAL CITY BANK, not merely prior to the filing dates of the intent-to-use applications. In other words, because applicant is relying on its use of CAPITAL CITY BANK as a defense to opposer's dilution claim, applicant's date of first use of CAPITAL CITY BANK, not the filing dates of its intent-to-use applications, is the operative date for determining the fame of opposer's marks. In this respect, a dilution claim is different from a likelihood of confusion claim.

In defending against a likelihood of confusion claim based on assertion of prior use of CAPITAL CITY BANK, applicant would have to show that CAPITAL CITY BANK and the marks in the intent-to-use applications are the same or essentially the same marks. In contrast, in defending

against the dilution claim, because the distinctiveness of opposer's CITIBANK marks is just as likely to be impaired by applicant's use of CAPITAL CITY BANK as it would be by applicant's proposed use of CAPITAL CITY BANK INVESTMENTS or CAPITAL CITY BANK GROWING BUSINESS, applicant does not have to show the marks to be the same or essentially the same. Put another way, if applicant's use of CAPITAL CITY BANK is not likely to dilute opposer's CITIBANK marks, then applicant's proposed use of CAPITAL CITY BANK in connection with any other words and/or designs is not likely to dilute opposer's marks, and it does not matter whether the marks are the same or essentially the same. Thus, in our determination of the date by which opposer must establish the acquisition of fame in its marks, opposer's focus on CAPITAL CITY BANK, with or without other words, as assertedly diluting of opposer's marks, effectively fixes the date of first use of CAPITAL CITY BANK as the time by which the fame of opposer's mark must be found to exist. *See Nissan Motor Co. v. Nissan Computer Corp.,* 378 F.3d 1002, 72 USPQ2d 1078, 1084 (9th Cir. 2004), *cert. denied,* 544 U.S. 974 (2005).

Because this case involves both a use-based application and intent-to-use applications, as discussed above, opposer has been on notice that it must prove that its mark became famous prior to applicant's first use of CAPITAL CITY BANK,

a mark in use by applicant, and applicant was not required to specifically plead use prior to opposer's establishment of fame. Moreover, as discussed below, we have found that applicant may tack its use-based application for CAPITAL CITY BANK onto its prior use of CAPITAL CITY BANK GROUP, to establish its asserted priority date, because this issue was tried by implied consent. In sum, for both likelihood of confusion and dilution, opposer was on notice that it must prove that its mark became famous prior to applicant's first use of CAPITAL CITY BANK and that applicant would be relying on its use of CAPITAL CITY BANK GROUP.[13]

### The Record

By rule, the record includes applicant's application files and the pleadings. Trademark Rule 2.122(b), 37 CFR §2.122(b). In addition, the parties introduced the following testimony:

A. Opposer's testimony.

1. The testimony deposition of Mary Anne Villanueva, opposer's Vice President of Global Branding and Identity.

---

[13] If only intent-to-use applications were at issue in this case, applicant would have been required to plead as an affirmative defense that it began using the CAPITAL CITY BANK portion of its marks prior to the time that opposer's marks became famous. *Cf. H.D. Lee Co. v. Maidenform Inc.,* 87 USPQ2d 1715, 1720 (TTAB 2008) ("Mere denial by applicant of opposer's allegation of priority of use is sufficient to put opposer on notice that it must prove its pleaded priority, but it is insufficient to put opposer on notice that any priority opposer will attempt to prove will have to predate the priority that applicant will attempt to prove through tacking").

2. The testimony deposition of Anne Moses, opposer's Senior Counsel for the Technology and Intellectual Property Group, with attached exhibits.

3. The testimony deposition of Anthony Michelini, opposer's Vice President of Global Consumer Insights, with attached exhibits.

4. The testimony deposition of Marie Veltre, opposer's former Manager for Marketing, Advertising and Communications, with attached exhibits.

B. Applicant's testimony.

1. The testimony deposition of Brooke Hallock, applicant's Vice President and Director of Marketing, with attached exhibits.

2. The testimony deposition of Joan Heffelbower, the Senior Vice President and Chief Financial Officer of Hastings City Bank, with attached exhibits.

3. The testimony deposition of Gregory K. Noren, Vice President of Marketing for City Bank of Lynwood, with attached exhibits.

4. The testimony deposition of Kirstin Pruitt, Senior Vice President and General Counsel of Lake City Bank, with attached exhibits.

5. The testimony deposition of Janess Sveet, Assistant Vice President and Marketing Manager for Gate City Bank, with attached exhibits.

11

6. The testimony deposition of Flecia L. Braswell, applicant's Chief Brand Officer, with attached exhibits.

7. The declaration of William C. Schrot, a member of the law firm representing applicant, with attached exhibits.[14]

## Standing

"Any person who believes that he would be damaged by the registration of a mark upon the principal register . . . may, file an opposition . . . stating the grounds therefor." Section 13 of the Trademark Act of 1946, 15 U.S.C. § 1063(a). *See also* Section 14 of the Trademark Act of 1946, 15 U.S.C. § 1064 in regard to cancellation proceedings. Thus, a party has standing to oppose or petition to cancel if it can demonstrate a real interest in the proceeding. *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). "The purpose in requiring standing is to prevent litigation where there is no real controversy between the parties, where a plaintiff, petitioner or opposer, is no more than an intermeddler." *Id.* To establish a reasonable basis for a belief that one is damaged by the mark sought to be registered, a plaintiff may assert a likelihood of confusion which is not wholly without merit. *Id.*

---

[14] The parties stipulated that applicant "may submit as testimony evidence the Declaration of William C. Schrot … and the exhibits attached thereto."

Anne Moses testified that opposer "officially made use" of CITIBANK as a service mark in connection with banking services in 1959[15] and it has since continuously made use of the mark.  This testimony is sufficient to demonstrate that opposer has a real interest in this proceeding and, therefore, has standing.  *Id.*

Prior Registration Defense

With respect to opposer's standing, applicant argued that because it is the owner of three incontestable registrations incorporating the term "Capital City Bank" for banking services, opposer cannot be damaged by the registration of the applications at issue.[16]  Applicant correctly explained the basis for the defense as follows:

> The laches defense, also known as the prior registration defense, stems from *Morehouse Mfg. Corp. v. J. Strickland & Co.,* 407 F.2d 881, 160 U.S.P.Q. 715 (C.C.P.A. 1969).  "The prior registration or *Morehouse* defense is an equitable defense, to the effect that if the opposer cannot be further injured because there already exists an injurious registration, the opposer cannot object to an additional registration that does not add to the injury."  *O-M Bread Inc. v. United States Olympic Comm.,* 65 F3d 933, 938, 36 U.S.P.Q.2d 1041, 1045 (Fed. Cir. 1995).[17]

---

[15] Moses Dep., pp. 24-25.  Anne Moses documented the continuous use of the CITIBANK mark in her deposition.
[16] Applicant's Brief, pp. 5-6 and 44-47.
[17] Applicant's Brief, p. 44 n.5.

This defense applies where an applicant owns a prior registration for essentially the same mark identifying essentially the same goods or services that are the subject of the proposed application. *Morehouse Mfg. Corp. v. J. Strickland & Co.,* 160 USPQ at 717; *Green Spot (Thailand) Ltd. v. Vitasoy International Holding Ltd.,* 86 USPQ2d 1283, 1285 (TTAB 2008).

"Insofar as the marks are concerned, the question in a situation such as this is whether the registered marks are, in fact, substantially the same marks so that they project the same image and symbolize a single and continuing commercial impression." *S & L Acquisition Co. v. Helen Arpels Inc.,* 9 USPQ2d 1221, 1226 (TTAB 1987); *see also O-M Bread Inc. v. United States Olympic Committee,* 65 F.3d 933, 36 USPQ2d 1041, 1045 (Fed. Cir. 1995) (the prior and proposed marks must be essentially the same). In other words, a change that does not alter the distinctive characteristics of a mark represents a continuity of trademark rights. If the distinctive character of the mark is not changed, the mark is, in effect the same and the rights obtained by virtue of the earlier registration should inure to the benefit of the pending application. *See Humble Oil & Refining Company v. Seksui Chemical Company Ltd. of Japan,* 165 USPQ 597, 603 (TTAB 1970).

The applicability of the prior registration defense depends upon whether the marks in the applications are substantially the same as the registered marks. That determination is based on applicant's display of the term "Capital City Bank" in its registered marks as shown below.



Opposer correctly notes that applicant focuses its prior registration defense entirely on the term "Capital City Bank" rather than the mark in its entirety.

> [Applicant's] design mark Registrations, in addition to all featuring the Star Logo, also imposed an additional, and very material, constraint on [applicant], namely that the words "CAPITAL CITY" both appear on the same line, and appear above (i.e., on a different line than) "BANK." This form of registration presents the brand as "CAPITAL CITY," as opposed to a "CITY BANK" brand with "CAPITAL" as a mere financial descriptor. . . . There are no such restrictions attendant to a word mark registration [presented in standard character form]. (Emphasis in the original).[18]

Because the applications are in standard character form, this means that applicant's rights in the words, specifically "Capital City Bank," are not limited to any

---

[18] Opposer's Reply Brief, p. 4.

special form; it encompasses all reasonable manners in which the term "Capital City Bank" could be depicted. *Fossil Inc. v. Fossil Group,* 49 USPQ2d 1451, 1454 (TTAB 1998). By way of example, applicant theoretically could present "Capital City Bank" as set forth below.

Capital
## *CITY BANK*

On the other hand, the marks in applicant's registrations are limited to the display shown in the registration and do not afford applicant rights in any other form. *Id.* We find that the mark CAPITAL CITY BANK, in standard character form, could create a different commercial impression than the mark in applicant's prior registrations. Accordingly, the marks displayed in applicant's registrations and applications do not form the same and continuing commercial impression and, therefore, are not essentially the same marks for purposes of the prior registration defense.

Further, with the exception of the application for the mark CAPITAL CITY BANK GROWING BUSINESS for "banking services; online banking services" (Serial No. 78930103), the services in applicant's registered marks ("banking services") are not substantially identical to the services in the applications. The recitation of services in Application Serial No. 78906010 for the mark CAPITAL CITY BANK includes, *inter alia,* electronic payment, namely,

electronic processing and transmission of bill payment data; brokerage and administration services in the field of securities, namely, mutual funds, stocks and bonds, annuities, tax advantaged securities, money market funds, self directed retirement accounts, including IRA portfolio management, 401(k) portfolio management, IRA and Roth portfolio management; and brokerage of life insurance and long term care insurance.  The recitation of services for Application Serial No. 78909113 for the mark CAPITAL CITY BANK INVESTMENTS and Application Serial No. 78934941 for the mark CAPITAL CITY BANC INVESTMENTS are for "brokerage and administration services in the fields of securities, namely, mutual funds, stocks and bonds, annuities, tax advantaged securities, money market funds, and self directed retirement accounts, including IRA portfolio management, 401(k) portfolio management, Simple IRA, and Roth IRA portfolio management; brokerage of life insurance and long-term care insurance."  While all the activities in the applications and registrations may fall under the broad umbrella of financial services, the applications include services different from the banking services listed in the registrations.[19]

---

[19] We note that the recitation of services in application Serial No. 78906010 for the mark CAPITAL CITY BANK also includes "banking services" as a separate and distinct service.  This belies applicant's assertion that financial services are substantially identical to banking services.  If banking services

Because the marks and services in applicant's prior registrations and pending applications are not essentially the same, applicant's prior registration defense is not applicable.

Priority

A.   Opposer's individual pleaded registrations.

If an opposer introduces into evidence its pleaded registrations, Section 2(d) priority is not an issue in such a case.  *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).  Trademark Rule 2.122(d) provides the following methods for opposer to introduce its pleaded registrations into evidence:

1.   Opposer may attach to the notice of opposition copies of the registrations prepared and issued by the United States Patent and Trademark Office ("USPTO") showing both the current status and current title to the registrations, or a current printout of information from the electronic database records for the USPTO showing the current status and title of the registrations.[20]

2.   During its testimony period, opposer may file a notice of reliance on copies of the registrations prepared

---

encompassed all financial services, there would be no need for applicant to recite anything other than banking services. Furthermore, there is no evidence in the record regarding the relationship between banking services and financial services and when banks expanded beyond traditional banking services and began rendering other types of financial services.

[20] Trademark Rule 2.122(d)(1).

by the USPTO showing both the current status and current title to the registrations;[21] or a notice of reliance on a current printout of information from the electronic database records for the USPTO showing the current status and title of the registrations.[22]

3. During its testimony period, opposer may introduce registrations through the testimony of a witness by appropriate identification.[23] The witness must testify that the registrations are still subsisting, and are owned by the opposer. *Cadence Industries Corp. v. Kerr,* 225 USPQ 331, 332 n.2 (TTAB 1985) (no probative value where testimony established opposer's ownership of the registration, but not the current status); *Sheller-Globe Corp. V. Scott Paper Co.,* 204 USPQ 329, 331 n.2 (TTAB 1979) (registration may be introduced as an exhibit to the testimony of a witness shown to have knowledge of the status and title of the registration).

Opposer introduced its pleaded registrations into evidence through the testimony of Anne Moses, opposer's Senior Counsel in the Technology and Intellectual Property Group. Her testimony regarding the registrations raises two issues. First, Ms. Moses did not expressly testify that the

---

[21] Trademark Rule 2.122(d)(2).
[22] *Research In Motion Limited v. NBOR Corporation*, 92 USPQ2d 1926, 1928 (TTAB 2009).
[23] Trademark Rule 2.122(d)(2).

registrations are owned by opposer and that they are currently subsisting. Second, in addition to the pleaded registrations, opposer, through Ms. Moses, introduced seven additional registrations. The additional registrations are set forth below.

1. Registration No. 0982066 for the mark CITICORP, in typed drawing form, for *inter alia* the following services:

> Consumer finance company services; industrial loan company services; factoring services; credit card servicing and the purchasing and servicing of consumer receivables associated therewith; commercial lending; servicing loans and extensions of credit; real estate lending; mortgage financing and mortgage servicing; investment advisory and financial advisory services; venture capital investments; making equity and debt investments in corporations or projects designed primarily to promote community welfare, in Class 36.[24]

2. Registration No. 1181467 for the mark CITI, in typed drawing form, for the following services:

> Financial services, namely, extending consumer and industrial loans to others; factoring services; credit card servicing and the purchasing and servicing of consumer receivables associated therewith; commercial lending; servicing loans and extensions of credit; real estate lending; mortgage financing and mortgage servicing; investment advisory and financial

---

[24] Moses Dep., Exhibit 7; issued April 9, 1974; Sections 8 and 15 affidavits accepted and acknowledged; second renewal.

advisory services; providing venture capital to others, in Class 36.[25]

3. Registration No. 1104470 for the mark CITI NEVER SLEEPS, in typed drawing form, for "financial services – namely, electronic banking services," in Class 36.[26]

4. Registration No. 1048704 for the mark CITIBANK and design, shown below, for "banking services," in Class 36.[27]

**CITIBANK**

5. Registration No. 2636299 for the mark CITIBANK and design, shown below, for the following services:

> Financial services; namely, banking;
> credit card services; electronic credit
> card transactions; commercial and
> consumer lending and financing; real
> estate and mortgage brokerage; trust,
> estate, and fiduciary management,
> planning and consulting; securities and
> mutual fund investment; brokerage and
> trading services; investment advisory
> and consulting services; securities
> brokerage and trading services;
> providing secure financial transactions
> in the nature of electronic cash
> transactions; electronic credit card
> transactions, electronic debit
> transactions, electronic check
> processing transactions and electronic
> transmission of bill payment data via a
> global computer network; insurance
> services, namely, underwriting and
> brokerage of property, casualty and life
> insurance policies and annuity

---

[25] Moses Dep., Exhibit 8; issued December 8, 1981; Sections 8 and 15 affidavits accepted and acknowledged; renewed.
[26] Moses Dep., Exhibit 9; issued October 7, 1981; Sections 8 and 15 affidavits accepted and acknowledged; renewed.
[27] Moses Dep., Exhibit 11; issued September 21, 1976; Sections 8 and 15 affidavits accepted and acknowledged; second renewal.

contracts; providing financial news and information via websites on a global computer network, in Class 36.[28]



6. Registration No. 2245102 for the mark CITIBANK CAMPUS, in typed drawing form, for "financial services, namely, checking and savings accounts, loans, and credit card services; financial consulting and information services," in Class 36.[29]

7. Registration No. 3155853 for the mark CITIBANK ON CAMPUS, in standard character form, for the following services:

> Financial services, namely, checking and saving accounts, credit card services, loan services in the nature of loan financing, student loan services and temporary loans; financial consulting and providing information in the field of financial services, in Class 36.[30]

While Ms. Moses did not expressly testify regarding the ownership and status of the registrations, we can infer a claim that opposer is the owner of the registrations because of the nature of the testimony. For example, Ms. Moses testified that "Citibank is our oldest and most, I would

---

[28] Moses Dep., Exhibit 12; issued October 15, 2002; Sections 8 and 15 affidavits accepted and acknowledged.
[29] Moses Dep., Exhibit 13; issued May 11, 1999; Section 8 affidavit filed on November 11, 2005.
[30] Moses Dep., Exhibit 17; issued October 17, 2006.

say, famous brand, it's the foundation off of which all of the other Citi marks are based. . . . So Citi, I would say, is our uber brand."[31]

With respect to current status of the registrations, opposer's counsel said, "Now the, next series of exhibits, Exhibits 10 – 17, I believe, are the currently registered Citibank marks."[32] However, applicant did not contest opposer's ownership of the registrations, nor questioned whether they were still in force. In fact, in its brief, applicant acknowledged that "Citigroup lists several registrations at page 7 of its Trial Brief", without any indication that it believed the registrations were not properly of record.[33] At page 7 of its brief, opposer specifically referenced all five pleaded registrations and four unpleaded registrations, as well as referencing Exhibits 6 and 10-17 (pleaded and unpleaded registrations). Accordingly, we treat the current status and title of the registrations as having been stipulated, that the unpleaded registrations have been tried by implied consent pursuant to Fed. R. Civ. P. 15(b), and that the notice of opposition is deemed amended to conform to the evidence.

---

[31] Moses Dep., p. 23.
[32] Moses Dep., p. 24. This is counsel's statement, not the testimony of the witness, and Ms. Moses did not affirm counsel's statement.
[33] Applicant's Brief, p. 10

In view of the foregoing, priority vis-à-vis opposer's registrations is not an issue in this case. *King Candy Co. v. Eunice King's Kitchen, Inc.,* 182 USPQ 108.

B. Opposer's family of marks.

To establish a family of marks, opposer must prove that, prior to applicant's first use of its mark, opposer established its family of marks. *Blansett Pharmacal Co., Inc. v. Carmrick Laboratories Inc.,* 25 USPQ2d 1473, 1477 (TTAB 1992); *Marion Laboratories v. Biochemical/Diagnostics,* 6 USPQ2d 1215, 1218 (TTAB 1988); *Plus Products v. Medical Modalities Associates, Inc.,* 217 USPQ 464, 465 n.8 (TTAB 1983) (the family of marks doctrine is applicable "where a plaintiff asserts that prior to defendant's first use of its mark in question, plaintiff established a family of marks that share a certain characteristic"). With respect to the applicability of the family of marks doctrine, we need to determine whether opposer established its family of CITIBANK marks prior to applicant's use of CAPITAL CITY BANK.

1. Applicant's use of CAPITAL CITY BANK.

Applicant was originally chartered as "Capital City Bank" in 1895 and it operated as CAPITAL CITY BANK until 1945. Applicant was rechartered as CAPITAL CITY NATIONAL BANK, a national banking association, in December 1945. The CAPITAL CITY BANK GROUP was formed in 1975 as a holding company for applicant's different banking entities. Since

24

the formation of the CAPITAL CITY BANK GROUP, applicant has advertised the banking services of the individual banks forming the "Capital City Bank Group" under the mark CAPITAL CITY BANK GROUP.[34]  For example, the advertisement shown below from the August 21, 1978 issue of the *Tallahassee Democrat* is representative of applicant's advertising through 1995.[35]



In 1982, Capital City Bank Group, Inc. holding company was formed.  In 1995, all the banks in the Capital City Bank Group became CAPITAL CITY BANK,[36] and applicant began promoting its services under that mark.  For example, Ms. Braswell identified the 1995 "marketing piece" set forth below advertising applicant's locations.[37]

---

[34] Braswell Dep., p. 30.  *See also* Braswell Exhibit 84.  Exhibit 84 is applicant's 1995 Annual Report containing a history of applicant.  Flecia Braswell testified that she had reviewed the history and that it was accurate.  (Braswell Dep., p. 96).  *See also* Braswell Exhibit 76, applicant's website, with a history of applicant, which Ms. Braswell testified that she had read and that it was accurate.  (Braswell Dep., p. 79).
[35] Braswell Dep., Exhibit 71.
[36] Braswell Dep., pp. 29-30, Exhibit 70 (Document No. 10590).
[37] Braswell Dep., p. 34; Exhibit 70 (Document No. 10606).



The first issue presented by applicant's attempt to rely on its use of CAPITAL CITY BANK GROUP to defeat opposer's family of marks claim is that applicant did not plead as an affirmative defense use of CAPITAL CITY BANK GROUP prior to opposer's establishment of its family of CITIBANK marks. Applicant's mere denial that "Opposer was and is the famous financial services company that owns a famous family of CITIBANK service marks and trademarks"[38] is not sufficient to put opposer on notice that the date that opposer will have to prove to establish its family of marks will have to predate applicant's first use of CAPITAL CITY BANK GROUP, a mark that is not the same as the marks for which registration is sought. *Cf. H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d at 1720.

Because applicant may not rely on an unpleaded defense, we must determine whether applicant's attempt to tack its

---

[38] Amended Notice of Opposition ¶1.

use of CAPITAL CITY BANK onto CAPITAL CITY BANK GROUP was tried by implied consent.

> Implied consent to the trial of an unpleaded issue can be found only where the nonoffering party (1) raised no objection to the introduction of the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue.

TBMP §507.03(b)(2nd ed. rev. 2004); *see also H.D. Lee Co. v. Maidenform Inc.,* 87 USPQ2d at 1721; *Boise Cascade Corp. v. Cascade Coach Co.,* 168 USPQ 795, 797 (TTAB 1970) ("Generally speaking, there is an implied consent to contest an issue if there is no objection to the introduction of evidence on the unpleaded issue, as long as the adverse party was fairly informed that the evidence went to the unpleaded issue").

Opposer did not lodge an objection to any evidence or testimony introduced by applicant, including the documents introduced by Flecia Braswell to establish the use of CAPITAL CITY BANK from the date it was established[39] and her testimony that "Capital City Bank Group was a well-known entity in our community" since at least the late 70's.[40]

> Q.   And did we ask you to look for historical documents establishing the use of Capital City Bank from when the bank was established?
>
> A.   Yes.
>
> Q.   And did you look for those documents?

---

[39] Braswell Dep., p. 11.
[40] Braswell Dep., p. 8.

27

> A. Yes.
>
> Q. And you've produced them for use today?
>
> A. Yes.[41]

We find that opposer was fairly apprised that applicant intended to prove that it had continually used CAPITAL CITY BANK since the founding of applicant. As part of this proffer of proof, applicant introduced exhibits chronicling applicant's historical use of CAPITAL CITY BANK including, CAPITAL CITY BANK GROUP, as well as CAPITAL CITY NATIONAL BANK. In view of the foregoing, we find that applicant's tacking of CAPITAL CITY BANK onto CAPITAL CITY BANK GROUP was tried by implied consent in accordance with Fed.R.Civ.P. 15(b) and applicant's amended answer is deemed amended to conform to the evidence.

To establish its first use of CAPITAL CITY BANK through its use of CAPITAL CITY BANK GROUP, "[t]he previously used mark [CAPITAL CITY BANK GROUP] must be the legal equivalent of the mark in question [CAPITAL CITY BANK] or indistinguishable therefrom, and the consumer should consider both as the same mark." *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.,* 926 F.2d 1156, 17 USPQ2d 1866, 1868 (Fed. Cir. 1991). In other words, CAPITAL CITY BANK must create the same, continuing commercial impression as CAPITAL CITY

---

[41] Braswell Dep., p. 11.

28

BANK GROUP. *Ilco Corp. v. Ideal Security Hardware Corp.,* 527 F.2d 1221, 188 USPQ 485, 487 (CCPA 1976).

CAPITAL CITY BANK GROUP and CAPITAL CITY BANK engender the same continuing commercial impression. The word "group" means "1. any collection or assemblage of persons or things; aggregation: *a group of protestors; a remarkable group of paintings.* 2. a number of persons or things ranged or considered together as being related in some way."[42] The commercial impression engendered by CAPITAL CITY BANK GROUP is merely a collection of CAPITAL CITY BANKS. The word "Group" adds nothing to the origin-indicating significance of CAPITAL CITY BANK and, therefore, CAPITAL CITY BANK and CAPITAL CITY BANK GROUP are essentially the same marks. *See American Security Bank v. American Security and Trust Co.,* 571 F.2d 564, 197 USPQ 65, 66-67 (CCPA 1978) (AMERICAN SECURITY is the legal equivalent to AMERICAN SECURITY BANK). In view of the foregoing, we find that applicant may rely on its use of CAPITAL CITY BANK GROUP to establish its priority date and that applicant has been using CAPITAL CITY BANK GROUP since 1975, the year CAPITAL CITY BANK GROUP was formed.

---

[42] The Random House Dictionary of the English Language (Unabridged), p. 844 (2nd ed. 1987). The Board may take judicial notice of dictionary evidence. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co.,* 213 USPQ 594, 596 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

2.   Opposer's family of CITIBANK marks.

In its brief, opposer did not address when it established its family of marks.  The earliest evidence of opposer promoting multiple "Citibank" marks together is a November 13, 2000 press release.[43]  On this record, applicant was using CAPITAL CITY BANK GROUP prior to the earliest possible date on which opposer could be viewed as having established a family of CITIBANK marks.[44]  In view thereof, opposer has not established that it had a family of marks prior to applicant's first use of its mark.  Therefore, the likelihood of confusion analysis will be based solely on the use of the individual marks in opposer's registrations.

## Likelihood of Confusion

---

[43] Moses Dep., Exhibit 33.  Ms. Moses testified that she was aware that press releases have been distributed and published through the Internet and in print publications.  (Moses Dep., p. 38).

[44] Even if CAPITAL CITY BANK GROUP and CAPITAL CITY BANK are not considered to be substantially the same, applicant's use of CAPITAL CITY BANK in 1995 still precedes opposer's earliest evidence of its family of CITIBANK marks.  Moreover, consumers will not perceive CAPITAL CITY BANK to be a member of the CITIBANK family of marks.  Opposer pled and argued that it has a family of CITIBANK marks, not a family of "Citi" marks.  Based on the evidence of record, opposer's family of marks is characterized by the name CITIBANK as the first or only word of the mark (*e.g.,* CITIBANK CAMPUS, CITIBANK and Compass Rose Design).  Furthermore, the name CITIBANK is the combination of the terms "Citi" and "Bank" with the letter "i" substituted for the letter "y" in "City."  CAPITAL CITY BANK does not share the characteristics of the CITIBANK family of marks because (1) it starts with the word "Capital," not CITIBANK, (2) "City Bank" is

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003).

A.    The fame of opposer's CITIBANK marks.

This *du Pont* factor requires us to consider the fame of opposer's marks. Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame may be measured indirectly by the volume of sales and advertising expenditures of the goods and services identified by the marks at issue, "by the length of time those indicia of commercial awareness have been evident," by widespread critical assessments and notice by independent sources of the products identified by the marks, as well as

---

two words, not a compound word, and (3) applicant's "City" is

31

by the general reputation of the products and services. *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1305-1306 and 1309.  Although raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, raw numbers alone may be misleading.  Some context in which to place raw statistics may be necessary (*e.g.,* the substantiality of the sales or advertising figures for comparable types of products or services).  *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1309.

Opposer has made long and extensive use of the term CITIBANK in one form or another since 1812.  Formed in 1812 as City Bank of New York,[45] opposer first began using the name CITIBANK as its cable address as early as 1897.[46] Customers shortened or abbreviated opposer's previous formal names (City Bank of New York, National City Bank and First National City Bank) to CITIBANK or CITY BANK, and, in 1959, opposer officially used CITIBANK as a service mark.[47]  Its legal name was changed to CITIBANK, N.A. in 1976.[48]

An article in the March 1, 1976 "Business & Finance" section of an unidentified newspaper reported that "[t]he nation's second largest commercial bank has announced an

---

spelled with a "y," not an "i."
[45] Moses Dep., p. 15.
[46] Moses Dep., p. 22; Exhibit 5.
[47] Moses Dep. p. 21.
[48] Moses Dep., p. 22.

official name change to Citibank."[49]  The article quoted opposer's president who explained that "the change came because over its 164-year history customers preferred to call the bank Citibank."

Ms. Moses testified that by 1967, opposer had become "the largest banking presence in the world."[50]  An article in the January 5, 1981 issue of *New Yorker* magazine referred to opposer as "the second-largest bank in the world."[51]  The article also reports that "[by] the nature of its undertakings, Citibank has a business interest in just about everything that happens, militarily, politically, and economically, almost everywhere in the world."

An article in the April 12, 1982 issue of *Barron's* magazine referenced "the seismic role Citibank is widely perceived to be playing" in the implementation of automated teller machines.[52]  In noting how opposer has climbed from third to number one among U.S. banks in earnings, the *Barron's* author stated the following:

> Indeed, Citi's public stature has less
> to do with its financial performance
> (which has been decidedly uneven over

---

[49] Moses Dep., Exhibit 26.  All of the articles referenced in this decision are to show how the authors perceive opposer as set forth in the articles, not that what the authors write is true.
[50] Moses Dep., p. 16.  We note that opposer's Exhibit 24, an article in the November 16, 1968 issue of *Business Week,* refers to opposer as "the nation's third largest bank."  We do not try to reconcile how "the largest banking presence in the world" can be "the nation's third largest bank," except to note that either statistic implies a significant presence.
[51] Moses Dep., p. 13; Exhibit 2.
[52] Moses Dep., Exhibit 27.

> the last decade) than the perception of
> it as the banking industry's dauntless
> pioneer.

A 1984 internal newsletter *CITIBANK NEWS* reported that opposer had customers in all fifty states with relationships with 11.7 million households or one out of seven households in the United States.[53]

Ms. Moses testified that "[a]lmost on a daily basis some part of Citigroup is mentioned in the press."[54] In further support of opposer's renown, Ms. Moses pointed out that opposer was the subject of two parodies on *Saturday Night Live.*[55]

In the regular course of business, opposer authorized corporate image tracking studies to measure the brand awareness of opposer's CITIBANK mark.[56] Anthony Michellini testified that the corporate image tracking studies show that, in 1983, CITIBANK had a 68% level of unaided awareness that grew to 90-95 percent in the studies done in the 1990s.[57] According to Mr. Michellini, this data shows that since 1990, CITIBANK has been a famous mark.[58] However,

---

[53] Moses Dep., pp. 13-14; Exhibit 3.
[54] Moses Dep., p. 34.
[55] Moses Dep., pp. 39-40. No dates were provided.
[56] Moses Dep., Exhibits 45-54; Michellini Dep., pp. 14-15.
[57] Michellini Dep., pp. 13, 33-34. Unaided awareness is a respondent's unprompted response (*e.g.,* in the financial field, which brands come to mind?) (Michellini Dep., p. 13).
[58] Michellini Dep., pp. 16, 32-34 and 38. Mr. Michellini used the term "iconic" brand rather than famous mark. He defined an "iconic brand" as one that is "known by . . . most people . . . it would have very high awareness." (Michellini Dep., p. 11).

Moses testified that CITIBANK has been famous since at least the early 1980s.[59]

The August 2001, 2002, 2003, and 2004 *BusinessWeek* magazine brand valuation by its consultant Interbrand ranked CITIBANK as the 13th most valuable brand with a brand value estimated in excess of 13 billion dollars.[60]  In the comments column in the 2001 evaluation, the author wrote the following:  "World's biggest bank.  The sun never sets on Sandy Weil's ever-expanding empire."

MillwardBrown ranked CITIBANK as the ninth most valuable brand with a value in excess of $31 billion in its 2006 BrandZ "Top 100 Brand Ranking."[61]  MillwardBrown is an independent third party that conducts brand evaluations on their own behalf and then sells the results.[62]  In the financial sector, CITIBANK is the highest ranking brand.

The MillwardBrown Optimor 2008 and 2009 BrandZ studies demonstrate a high level of brand awareness for the CITIBANK mark.[63]  The 2008 report shows that "Citibank, Chase and BofA, Bank of America, are in the top tier of banking brands

---

[59] Moses Dep., p. 29.
[60] Moses Dep., Exhibits 55-58.
[61] Michellini Dep., pp. 20-21; Exhibit 98.
[62] Michellini Dep., p. 17.
[63] Michellini Dep., Exhibits 96 and 97.

nationally with, you know, in the 90, approximately 90 percent level of unaided plus aided awareness."[64]

In view of the foregoing, we find that CITIBANK is a famous mark.

B.    The similarity or dissimilarity and nature of opposer's services and the services described in the application.

1.    Serial No. 78906010 for the mark CAPITAL CITY BANK.

The table below shows that the services recited in the CAPITAL CITY BANK application are in part identical to the services recited in two of opposer's registrations.

| CAPITAL CITY BANK<br>Banking services | CITIBANK (Reg. No. 0691815)<br>Banking services |
|---|---|
| **CAPITAL CITY BANK**<br><br><br>Credit and cash card services | **citibank**<br><br><br>Credit card services |
| Brokerage and administration services in the field of securities, namely, mutual funds, stocks and bonds, annuities, tax advantaged securities, money market funds, self directed retirement accounts, including IRA portfolio management, 401(k) portfolio management, simply (sic) IRA and Roth portfolio management | Securities and mutual fund investment; brokerage and trading services; investment advisory and consulting services; securities brokerage and trading services |
| Commercial and consumer lending services | Commercial and consumer lending and financing |
| Real estate and mortgage brokerage services | Real estate and mortgage brokerage |
| Brokerage of life insurance and long term care insurance | Insurance services, namely, underwriting and brokerage of property, casualty and life insurance policies and annuity |

---

[64] Mihcellini Dep., p. 19.  "Aided awareness" is presenting the repondent with the name of the brand and asking whether the respondent has heard of the brand.  (Michellini Dep., p. 12).

| | |
|---|---|
| | contracts |
| Electronic processing and transmission of bill payment data | Electronic transmission of bill payment data via a global computer network |
| Estate trust management; estate planning | Trust, estate, and fiduciary management, planning and consulting |

    2.    <u>Application Serial No. 78909113 for the mark CAPITAL CITY BANK INVESTMENTS and Serial No. 78934941 for the mark CAPITAL CITY BANC INVESTMENTS</u>.

Applicant is seeking to register these marks for the following services:

> Brokerage and administration services in the fields of securities, namely, mutual funds, stocks and bonds, annuities, tax advantaged securities, money market funds, and self directed retirement accounts, including IRA portfolio management, 401(k) portfolio management, Simple IRA, and Roth IRA portfolio management.

As indicated above, opposer's **citibank** mark is registered for, *inter alia*, the following services:

> Securities and mutual fund investment; brokerage and trading services; investment advisory and consulting services; securities brokerage and trading services.

Accordingly, we find that the services in the applications are essentially identical to opposer's services.

    3.    <u>Application Serial No. 78930103 for the mark CAPITAL CITY BANK GROWING BUSINESS</u>.

Applicant is seeking to Register CAPITAL CITY BANK GROWING BUSINESS for banking services and online banking services.  Opposer's Registration No. 0691815 for the mark CITIBANK is registered for banking services.  Thus, the services in the application and the registration are legally identical.

38

C. The similarity or dissimilarity of likely-to-continue trade channels and classes of consumers.

Because we have found that the parties' services are in part identical, and the description of services lack any restrictions as to channels of trade and classes of consumers, we must presume that the channels of trade and classes of purchasers are the same. *Hewlett Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002) ("[A]bsent restrictions in the application and registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers"); *Squirtco v. Tomy Corp.*, 697 F.2d 1038, 216 USPQ 937, 940 (Fed. Cir. 1983) ("[I]n the absence of specific limitations in the registration, [the issue of likelihood of confusion is resolved] on the basis of all normal and usual channels of trade and methods of distribution"); *Genesco Inc. v. Martz,* 66 USPQ2d 1260, 1268 (TTAB 2003) ("Given the in-part (sic) identical and in-part (sic) related nature of the parties' goods, and the lack of any restrictions in the identifications thereof as to trade channels and purchasers, these clothing items could be offered and sold to the same classes of purchasers through the same channels of trade"); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the

same channels of trade, and be sold to the same class of purchasers").

D.    The nature and extent of any actual confusion.

Because there is no evidence of any reported instances of actual confusion,[65] applicant argued that this is "powerful" evidence that there is no likelihood of confusion.[66]  Opposer argued to the contrary that because applicant's "Star Logo registrations differ so greatly from its pending word mark Applications" and because there is a lack of any significant concurrent geographic use, the lack of any reported instances of actual confusion is not probative.[67]

The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by applicant of its mark for a significant period of time in the same markets as those served by opposer under its marks.  *Gillette Canada Inc. v. Ranir Corp.,* 23 USPQ2d 1768, 1774 (TTAB 1992).  In other words, for the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred.  *Barbara's Bakery Inc. v. Landesman,* 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the

---

[65] Opposer's response to applicant's interrogatory No. 6; Moses Dep., p. 76; Braswell Dep., pp. 40, 93
[66] Applicant's Brief, p. 35.
[67] Opposer's Brief, pp. 23-24; Opposer's Reply Brief, p. 18.

absence of actual confusion depends upon there being a significant opportunity for actual confusion to have occurred); *Red Carpet Corp. v. Johnstown American Enterprises Inc.,* 7 USPQ2d 1404, 1406-1407 (TTAB 1988); *Central Soya Co., Inc. v. North American Plant Breeders,* 212 USPQ 37, 48 (TTAB 1981) ("the absence of actual confusion over a reasonable period of time might well suggest that the likelihood of confusion is only a remote possibility with little probability of occurring").

In the *Nina Ricci* case, discussed by both parties, the Court of Appeals for the Federal Circuit noted that the absence of any reported instances of actual confusion was not probative because the record failed to establish that there was a reasonable opportunity for confusion to have occurred. *Nina Ricci S.A.R.L. v. E.T.F. Enterprises, Inc.,* 889 F.2d 1070, 12 USPQ2d 1901, 1903 (Fed. Cir. 1989).

> The absence of any showing of actual confusion is of very little, if any probative value here because (1) no evidence was presented as to the extent of ETF's use of the VITTORIO RICCI mark on the merchandise in question in prior years, and (2) the Board specifically found that ETF was not selling such merchandise at the time of the opposition proceeding in its own stores or elsewhere.

*Id.*

We do not agree with opposer's assertion that applicant's "Star logo registrations differ so greatly from

[applicant's] pending word mark Applications" that the lack of any reported instances of any actual confusion is not probative. The dominant portion of applicant's "Star logo registrations" is the name CAPITAL CITY BANK because it is that portion of the mark that consumers will use to refer to applicant. *CBS Inc. v. Morrow,* 708 F.2d 1579, 218 UPSQ 198, 200 (Fed. Cir. 1983). Moreover, it is the word portion of applicant's mark that opposer objects. While the marks that applicant now seeks to register are different from its previously-registered marks, the commercial impression engendered by applicant's "Star logo registrations" is based on the name CAPITAL CITY BANK and the concurrent use of applicant's logo marks and opposer's CITIBANK marks has presented a reasonable opportunity for confusion to have occurred.[68]

As indicated above, opposer contends that the lack of any reported instances of actual confusion has no probative value because there is no geographic overlap between opposer's bank branches and applicant's bank branches.[69]

---

[68] Our finding here is not inconsistent with our denial of applicant's prior registration defense. In the prior registration defense, we were required to determine whether the marks in the applications are essentially the same as the marks applicant previously registered. In determining whether there has been a reasonable opportunity for confusion to have occurred, we are not required to find that applicant's use of its mark in another form is essentially the same as the marks at issue. It is sufficient that applicant's marks engender the same commercial impression. *Cf. In re 1st USA Realty Professionals Inc.,* 84 USPQ2d 1581, 1588 (TTAB 2007).

[69] Moses Dep., pp. 76-77.

Opposer's contention is contradicted by the research of William Schrot, one of applicant's attorneys, who presented his findings in a declaration.  Mr. Schrot testified that the parties have branches near each other.  Mr. Schrot used the "Find Citi Locations" application on opposer's website "to determine whether Opposer has Citibank locations in or near the cities in which Applicant's branches are located."[70]  Mr. Schrot summarized his research in a table reproduced below.[71]

**TABLE V**

| # | CITY, STATE | NO OF APPLICANT LOCATIONS | NO. OF CITIBANK LOCATIONS | CITIBANK LOCATIONS NEARBY |
|---|---|---|---|---|
| 1 | Alachua, Florida | 2 | 1 | YES ( 1.83 miles) |
| 2 | Gainesville, Florida | 5 | 14 | YES ( 0.84 miles) |
| 3 | High Springs, Florida | 1 | - | YES ( 8.52 miles) |
| 4 | Jonesville, Florida | 1 | - | YES ( 1.70 miles) |
| 5 | Newberry, Florida | 2 | 1 | YES ( 7.07 miles) |
| 6 | Crystal River, Florida | 1 | 2 | YES ( 1.96 miles) |
| 7 | Citrus Springs, Florida | 1 | - | YES ( 6.13 miles) |
| 8 | Floral City, Florida | 1 | - | YES ( 7.11 miles) |
| 9 | Inverness, Florida | 1 | 1 | YES ( 0.91 miles) |
| 10 | Havana, Florida | 1 | - | YES ( 7.07 miles) |
| 11 | Spring Hill, Florida | 2 | 8 | YES ( 0.14 miles) |
| 12 | Tallahassee, Florida | 18 | 12 | YES (1.60 miles) |
| 13 | Inglis, Florida | 1 | - | YES ( 11.86 miles) |
| 14 | Williston, Florida | 1 | - | YES ( 7.23 miles) |
| 15 | Port Richey, Florida | 1 | 3 | YES ( 1.12. miles) |

---

[70] Schrot Declaration ¶13.
[71] Schrot Declaration ¶13.

| # | CITY, STATE | NO OF APPLICANT LOCATIONS | NO. OF CITIBANK LOCATIONS | CITIBANK LOCATIONS NEARBY |
|---|---|---|---|---|
| 16 | Palatka, Florida | 2 | 1 | YES ( 2.18 miles) |
| 17 | Hastings, Florida | 1 | - | YES ( 10.85 miles) |
| 18 | Macon, Georgia | 5 | 2 | YES ( 3.5 miles) |
| 19 | Thomnasville, Georgia | 1 | 1 | YES ( 2.07 miles) |

Further, opposer's national advertising encompasses areas where it does not have branch locations.

Q. And you understand that the Citibank branches are in certain regions in the country?

A. Yes, of course.

Q. And we're talking now about national advertising that goes across the country, not just in the bank trading areas.

A. Exactly. So we do regional through cable and through regional publications, but we also do national advertising that goes across the country.

Q. Now, why does Citibank advertise in areas across the country where it doesn't have branches?

A. Well, it's very important to keep up our presence and continue communicating what we stand for because we have a very large credit card base, credit card customer base that goes beyond the bank trading areas, and so we need to maintain that presence.[72]

---

[72] Villanueva Dep., pp. 14-15.

44

Furthermore, opposer's renown extends nationwide. Not only is opposer's mark famous for purposes of determining likelihood of confusion, but it has met the more rigorous standard of fame for purposes of dilution.[73] In this regard, opposer has proven that CITIBANK is so well-known that it has a national presence even if it does not have branches in a particular geographic region.

> Q. And so in areas where there's not a physical branch location, is it your opinion that Citibank does not have a presence there?
>
> A. No, no. We have - - we have presence nationally. As you can see in the BrandZ study that we were looking at a little bit ago, our brand has presence nationally.
>
> Q. And so Citibank would have a presence in the same markets as all of these third-party banks we've discussed already, is that right?
>
> A. I would think so, yes.[74]

---

[73] Fame for dilution requires a more stringent showing. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USQP2d at 1694; *Toro Co. v. ToroHead Inc.*, 61 USPQ2d at 1170. A mark, therefore, may have acquired sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame. *Toro Co. v. ToroHead Inc.*, 61 USPQ2d at 1170, *citing I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 47 USPQ2d 1225, 1239 (1st Cir. 1998) ("[T]he standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection").
[74] Michellini Dep., pp. 55-56.

In fact, Mr. Michellini and Ms. Villanueva both testified that CITIBANK is a nationally-known brand.[75]  Mr. Michellini testified that CITIBANK has been a famous mark since 1990,[76] while Ms. Moses testified that CITIBANK has been famous since as early as the 1980's.[77]

Ms. Braswell testified that applicant has been a well-known community bank since the late 1970s.[78]  Applicant has 69 branch locations in Florida, Georgia and Alabama.  There are only two branches in Alabama, the rest are in Florida and Georgia.  In addition, applicant provides offsite ATM machines.[79]

Finally, both parties assert that they have customers in all fifty states.[80]

Based on this evidence, we find that there has been a reasonable opportunity for confusion to have occurred and that the lack of any reported instances of confusion weighs against finding that there is a likelihood of confusion.

---

[75] Michellini Dep., p. 16; Villanueva Dep., pp. 26-27.  Mr. Michellini and Ms. Villanueva testified that marketing people refer to famous marks as iconic brands.  According to Ms. Villaneuva, "An iconic brand refers to a brand that's a household name that, if you would ask individuals across the nation generally, most people would know about that brand."  (Villanueva Dep., p. 27).  *See also* Michellini Dep., p. 11.
[76] Michellini Dep., pp. 16, 34 and 38.
[77] Moses Dep., p. 29.
[78] Braswell Dep., p. 8
[79] Hallock Dep., pp. 11-12 and 72.
[80] Moses Dep., pp. 13-14 and Exhibit 3; Hallock Dep., p. 11; Braswell Dep., p. 109.

E.  The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.  *In re E. I. du Pont De Nemours & Co., supra.*  In a particular case, any one of these means of comparison may be critical in finding the marks to be similar.  *In re White Swan Ltd.,* 9 USPQ2d 1534, 1535 (TTAB 1988); *In re Lamson Oil Co.,* 6 USPQ2d 1041, 1042 (TTAB 1988).

A major part of applicant's argument that CAPITAL CITY BANK is not similar to CITIBANK is the inherent weakness of the term "City Bank."  To support its position that the marks are not similar, applicant introduced evidence that the term "City Bank" is commonly used in connection with banking services.  In other words, applicant contends that CITIBANK is inherently weak and entitled to only a narrow scope of protection or exclusivity of use despite its marketplace renown.  William Schrot introduced into evidence 40 different websites for entities purporting to render banking services that include the term "City Bank" in their names, including CITY BANK (Missouri), CITYBANK (Washington),[81] and CITY BANK (Texas), as well as the

---

[81] The "City Bank of Lynwood" is discussed below.

47

websites for CITY BANK NEW MEXICO, CITY BANK OF HARTFORD, CITY BANK & TRUST (Nebraska) and CITY BANK & TRUST (Louisiana).[82]  In addition, Mr. Schrot introduced a copy of the website for CITY NATIONAL BANK purporting to have offices in West Virginia, Ohio and Kentucky.  The bank displays its mark as set forth below:



There was also a FIRST CITY BANK in Columbus, Ohio and a First City Bank in five locations in Florida.  With the exception of CITY NATIONAL BANK, the third-party banks are community banks or located within one state.[83]

Furthermore, based on the information in the third-party websites and from opposer's "Find Citi Locations" website application, Mr. Schrot compared the locations of the third-party banks with Citibank locations to determine proximity (*e.g.,* CITY BANK (Missouri) was within 20 miles of opposer, CITYBANK (Washington) was within 3 miles of opposer, CITY BANK NEW MEXICO was within 67 miles of opposer).

Mr. Schrot also introduced into evidence a copy of Registration No. 3240918 for the mark SURF CITY BANK for

---

[82] Schrot Declaration ¶5.  Applicant introduced more evidence of third-party use than discussed in the decision.  We discuss the evidence that we found most relevant.

48

"banking services and financial services in the field of money lending" registered on the Supplemental Register,[84] as well as copies of the following registrations for marks incorporating the term "Cities Bank" for banking services:

1.  Registration No. 3121171 for the mark UNITED CITIES BANK;

2.  Registration No. 2393231 for the mark RIVER CITIES BANK; and

3.  Registration No. 2452119 for the mark BAY CITIES BANK.

Finally, applicant took the testimony depositions of officers from four third-party "City Banks":  Hastings City Bank, City Bank of Lynwood, Lake City Bank, and Gate City Bank.  The testimony from the third-party witnesses is summarized below:

1.  Hastings City Bank is a Michigan community bank with five branches.  It has been using the name Hastings City Bank since 1886.  The name Hastings City Bank is displayed with an HCB logo.[85]

2.  City Bank of Lynwood is a Washington state community bank with eight branches.  It was founded in 1974.

---

[83] A "community" bank is a bank with "a local presence."  Its focus is on the community where it is located.  (Heffelbower Dep., p. 22; Pruitt Dep., p. 28)

[84] Registration on the Supplemental Register is an admission by the registrant that the term was merely descriptive of its services, at least at the time of registration. *Quaker State Oil Refining Corporation v. Quaker Oil Corporation,* 453 F.2d 1296, 172 USPQ 361, 363 (CCPA 1972); *In re Central Soya Company, Inc.,* 220 USPQ 914, 916 (TTAB 1984).

[85] Heffelbower Dep.

The phones at the bank are answered "City Bank." The bank's logo displays the name "City Bank" as one word: CITYBANK.[86]

3. Lake City Bank is an Indiana community bank with 43 branches. It was founded in approximately 1871. Although all its branches are in Indiana, the bank has customers in a majority of the states. Lake City Bank is a full service financial institution offering consumer and commercial deposits and loans, a trust department and a retail brokerage department. The bank's logo includes the design of a sail boat.[87]

4. Gate City Bank is a mutual financial institution with 28 branches in Montana and two branches in North Dakota.[88] It was founded in 1923 as Gate City Federal Savings Bank and it became Gate City Bank in 2000. Gate City Bank has customers in every state. The bank's logo features a circular design.[89]

Opposer contends that applicant's evidence of third-party use has little, if any, probative value because opposer has rigorously policed the use of the name "City Bank" by third parties. Opposer identified its criteria for analyzing third-party use of the term "City Bank" as follows:

---

[86] Noren Dep.
[87] Pruitt Dep.
[88] A "mutual financial institution" is depositor owned. (Sveet Dep., p. 42).
[89] Sveet Dep.

> Opposer did not and does not object to uses of CITY BANK which are (i) geographically descriptive, (ii) local in geographical reach, and/or (iii) used with distinctive logos of graphical presentations.  Further, Opposer makes a distinction in policing decisions between third party (sic) use of CITY BANK marks, as opposed to attempted federal <u>registration</u> of such marks. (Emphasis in original – internal citations omitted).[90]

The frequent adoption and third-party use of the term "City Bank" suggests that third parties use the word "Bank" in the term "City Bank" as a generic designation for banking services while the word "City" is used as part of a geographic name (*e.g.,* Lake City – bank, Hastings City – bank) or, in the alternative, as a designation for a community bank (*e.g.,* City Bank of Lynwood or First City Bank).  Accordingly, while opposer may have the exclusive right to use CITIBANK, the term "City Bank" is used by others to convey the alternative meanings described above. Notwithstanding the various uses of "City Bank," these uses do not diminish the strength of opposer's mark.

With respect to the marks at issue, applicant's marks are superficially similar to opposer's marks to the extent applicant's marks include the term "City Bank" while opposer has used and registered the term "Citibank."  However, because applicant's marks start with the word "Capital," the

---

[90] Opposer's Brief, pp. 24-25, *citing* Moses Dep., pp. 56-57, 144-147, and 158.

commercial impression engendered by applicant's marks is entirely different. Applicant's marks will be perceived as CAPITAL CITY . . . bank, not as CAPITAL . . . CITY BANK. In applicant's CAPITAL CITY BANK marks, the term "Capital City" is perceived as a geographic designation and "Bank" is a generic designation. As such, we note that applicant's marks fall outside of opposer's own criteria for identifying similar marks likely to cause confusion with opposer's CITIBANK marks.[91]

Our finding that the term "Capital City" is the dominant element in creating the commercial impression engendered by applicant's marks is supported by its location as the beginning of applicant's marks. *Presto Products Inc. v. Nice-Pak Products, Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered"). *See also Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005)("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark and the first word to appear on the label); *Century 21*

---

[91] In the prior registration defense discussion, we noted that applicant could theoretically present CAPITAL CITY BANK in such a way as to emphasize "CITY BANK" and minimize the word "capital." However, in light of the fame of opposer's marks and applicant's historical use of its mark, we do not consider this a reasonable manner in which applicant's mark could be depicted.

*Real Estate Corp. v. Century Life of America,* 23 USPQ2d at 1700 (Fed. Cir. 1992) (upon encountering the marks, consumers must first notice the identical lead word).

Since the commercial impression of applicant's marks is the geographic designation CAPITAL CITY and the generic term "Bank," applicant's marks are not similar in appearance, sound or meaning with opposer's CITIBANK marks. The absence of any reported instances of actual confusion lends credence to this finding because, considering the widespread advertising of opposer's marks and the identity of the services, if the marks were similar then it is likely that there would be some reported instances of confusion or mistake as to source such as misdirected telephone calls, visits, or requests for information, or other indicia of confusion in the marketplace.

In view of the foregoing, we find that applicant's marks are not similar to opposer's marks.

D.    Balancing the factors.

We have reviewed all of the evidence of record and considered all of the arguments by the parties, including evidence and arguments not specifically discussed in the opinion, regarding the *du Pont* likelihood of confusion factors. On the one hand, opposer's CITIBANK marks are famous and the services of the parties are in part identical and, therefore, we presume that they move in the same

channels of trade and are rendered to the same classes of consumers. On the other hand, we find that the marks are not similar and that there have not been any reported instances of actual confusion despite significant opportunity for confusion to have occurred. Moreover, the third-party use of "City Bank" demonstrates that the public will interpret the word "Bank" in applicant's mark as a generic designation and the word "City" as a part of a geographic name or, in the alternative, as identifying a community bank.

We find that the significant differences between applicant's CAPITAL CITY BANK marks and opposer's CITIBANK marks outweigh the fame of opposer's marks. We are not persuaded that opposer's CITIBANK marks would be associated with applicant's CAPITAL CITY BANK marks and, therefore, we find that applicant's CAPITAL CITY BANK marks used in connection with banking and financial services are not likely to cause confusion with opposer's CITIBANK marks for the same services.

Dilution

In addition to its Section 2(d) claim, opposer has asserted a dilution claim. The Lanham Act provides for a cause of action for the dilution of famous marks. Sections 13 and 43(c) of the Lanham Act, 15 U.S.C. §§ 1063 and 1125(c).

54

The Lanham Act provides as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Opposer contends that applicant's marks will "blur" the distinctiveness of opposer's marks.[92]  The Lanham Act defines dilution by blurring as follows:

> "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark
>
> that impairs the distinctiveness of the famous mark.[93]

With respect to fame, the dilution analysis requires consideration of the following issues:

1.    Whether CITIBANK is a famous mark;

2.    Whether CITIBANK became famous prior to applicant's use of CAPITAL CITY BANK; and,

3.    Whether CAPITAL CITY BANK is likely to cause dilution by blurring of the distinctiveness of CITIBANK.

---

[92] Opposer's Brief, p. 30.
[93] Section 43(c)(2)(B) of the Lanham Act, 15 U.S.C. §1125(c)(2)(B).

55

A.  Whether opposer's mark became famous prior to applicant's use of CAPITAL CITY BANK?

We have already determined that opposer's CITIBANK marks have achieved the high standard of fame required to establish dilution.  However, opposer mistakenly contends that it must prove that its CITIBANK marks have become famous prior to the filing date of applicant's applications. As we noted in footnote 8, "[i]n a use-based application under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(a), the party alleging fame must show that the mark had become famous prior to the applicant's use of the mark." *Toro Co. v. ToroHead Inc.,* 56 USPQ2d at 1174 n.9.  Since the CAPITAL CITY BANK application is a use-based application, opposer must prove that its CITIBANK mark became famous prior to applicant's first use of CAPITAL CITY BANK.

In the family of marks discussion, we found that applicant established that it began using CAPITAL CITY BANK in 1975.  Also, we determined that, based on the record before us, opposer's marks were famous as of 1983.  Opposer argued, however, that "[t]he fame of the CITIBANK Marks was confirmed by, inter alia, at least one federal court decision as early as 1979," citing *Citibank, N.A. v. City Bank of San Francisco,* 206 USPQ 997, 1004 (N.D.Cal. 1980).[94]

---

[94] Opposer's Brief, p. 40.

The decision by another court based upon a different record is not evidence in this proceeding. Section 17(a) of the Trademark Act of 1946, 15 U.S.C. § 1067(a), gives the Board the authority and duty to decide the right to registration in an opposition. This duty may not be delegated by the adoption of conclusions reached by another court on a different record. Suffice it to say that an opposition must be decided on the evidence of record. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin*, 73 USPQ2d at 1691 (likelihood of confusion is a legal conclusion based on case-specific factual underpinnings); *cf. In re Sunmarks Inc.*, 32 USPQ2d 1470, 1472 (TTAB 1994).

The doctrine of *stare decisis* may be defined as the policy of courts to stand by precedent and not to disturb a settled point. Black's Law Dictionary (8th ed. 2004).

> Essentially, this doctrine provides that, when a court has once laid down a principle of law as applicable to a certain set of facts, it will adhere to that principle, and apply it to all future cases, where the facts are substantially the same, regardless of whether the parties and properties are the same. … It is clear, however, that this doctrine is one of policy and whether a previous holding of the court shall be adhered to, *modified*, or *overruled* is within the court's discretion under the circumstances of the case before it.

*In re Johanna Farms Inc.*, 8 USPQ2d 1408, 1410 (TTAB 1988) (internal citations omitted).

57

With respect to the doctrine of *stare decisis,* it has been held that findings of fact in an opposition between opposer and a third party cannot be used against applicant because applicant had no opportunity to cross-examine the witnesses offered by opposer in the prior proceeding. *Hyde Park Footwear Company, Inc. v. Hampshire-Designers, Inc.,* 197 USPQ 639, 641 (TTAB 1977); *Sales Analysis Institute, Inc. v. Sales Training, Inc.*, 181 USPQ 341, 341 n.1 (TTAB 1973). For exactly the same reason -- the absence of an opportunity to cross-examine witnesses or offer rebuttal testimony -- as well as another reason -- that the facts presented in a case decided in 1980 were not introduced into this record -- applicant cannot be bound by the findings of fact by another court that were not duplicated in this proceeding.

Based on this record, opposer's marks became famous in 1983, while applicant first used its CAPITAL CITY BANK mark in another form in 1975. Accordingly, because opposer did not prove that its CITIBANK marks became famous prior to applicant's first use of its mark, opposer's dilution claim fails.

B.    Dilution by blurring.

In addition, we have considered whether the mark CAPITAL CITY BANK is likely to dilute opposer's CITIBANK marks.

"Dilution diminishes the 'selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public.'" *Toro Co. v. ToroHead Inc.,* 61 USPQ2d at 1182, *quoting Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624-25, 217 USPQ 658, 661 (2nd Cir. 1983). Dilution by blurring occurs when a substantial percentage of consumers, upon seeing the junior party's use of a mark on its services [in this case CAPITAL CITY BANK used in connection with banking and financial services], are immediately reminded of the famous mark [in this case CITIBANK] and associate the junior party's use with the owner of the famous mark, even if they do not believe that the services emanated from the famous mark's owner. *Toro Co. v. ToroHead Inc.,* 61 USPQ2d at 1183.

The Board may look to all relevant facts in determining whether applicant's CAPITAL CITY BANK service mark will blur the distinctiveness of opposer's CITIBANK marks. The Trademark Act provides the following guidance:

> In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:
>
> (i) The degree of similarity between the mark or trade name and the famous mark.
>
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

1.  The degree of similarity between the mark or trade name and the famous mark.

For purposes of dilution, a party must prove more than confusing similarity; it must show that the marks are "identical or very substantially similar." *Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.,* 77 USPQ2d at 1514, *quoting Toro Co. v. ToroHead, Inc.,* 61 USPQ2d at 1183. As the Board explained in *Toro Co. v. ToroHead, Inc.*:

> The test for blurring is not the same as for determining whether two marks are confusingly similar for likelihood of confusion purposes. "To support an action for dilution by blurring, 'the marks must be similar enough that a significant segment of the target group sees the two marks as essentially the same.'" *Luigino's, Inc.,* 170 F.3d at 832, 50 USPQ2d at 1051[95] (quoting 2 McCarthy on Trademarks and Unfair Competition, §24:90.1 (4th ed. 1998). Therefore, differences between the marks are often significant. Mead Data (LEXUS

---

[95] *Luigino's , Inc. v. Stouffer Corp.,* 170 F.3d 827, 50 USPQ2d 1047 (8th Cir. 1999).

for cars did not dilute LEXIS for database services).[96]

*Toro Co. v. ToroHead, Inc.,* 61 USPQ2d at 1183 (TORO and ToroMR and Design are not substantially similar for dilution purposes). *But see Starbucks Corp. v. Wolfe's Borough Coffee Inc.,* 588 F.3d 97, 92 USPQ2d 1769, 1775-1776 (2nd Cir. 2009) ("Consideration of a 'degree' of similarity as a factor in determining the likelihood of dilution does not lend itself to a requirement that the similarity between the subject marks must be 'substantial' for a dilution claim to succeed" and, therefore, "the District Court erred to the extent it focused on the absence of 'substantial similarity' between the Charbucks Marks and the Starbucks Marks to dispose of Starbucks' dilution claim"). Nevertheless, we adhere to the substantially similar standard articulated above because for dilution to occur the marks must at least be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same. *See Century 21 Real Estate LLC v. Century Surety Co.,* 2007 WL 433579 (D. Ariz. 2007), *aff'd.,* 300 Fed. Appx. 527, 2008 WL 4946336 (9th Cir. 2008) (substantial similarity is necessary to support a federal dilution claim); McCarthy on Trademarks and Unfair Competition §24:117 (4th ed. 2009); *see also Jet, Inc. v. Sewage Aeration Systems,* 65 F.3d 419,

---

[96] *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1065, 10 USPQ2d 1961 (2nd Cir. 1989).

49 USPQ2d 1355, 1399 (6th Cir. 1999) ("The purpose of anti-dilution laws is to provide a narrow remedy when the similarity between two marks is great enough that even a noncompeting, nonconfusing use is harmful to the senior user … The degree of similarity required for a dilution claim must be greater than that which is required to show likelihood of confusion").  In other words, dilution is defined by identical or substantially similar marks. However, "[t]he statutory factor referring to the 'degree of similarity' between the conflicting marks indicates that the exact identity is not required by the statute itself for blurring to be likely, but … without identity or near identity, the injury of blurring is unlikely."  McCarthy on Trademarks and Unfair Competition §24:117.  This interpretation is consistent with the requirement that we also consider the degree of inherent or acquired distinctiveness of the famous mark and the degree of recognition of the famous mark even though the plaintiff's mark must be famous as a prerequisite for bringing a dilution claim.

Section 43(c) of the Trademark Act lists six non-exhaustive factors for the courts and the Board to consider in determining whether there is dilution by blurring, but there is no requirement that each factor must be weighed equally in each case.  The requirement is to consider each

factor. The Second Circuit statement in Starbucks that "to the extent that [the District Court] required 'substantial' similarity between the marks … the court may also have placed undue significance on the similarity factor in determining the likelihood of dilution" can be read to suggest a general rule that all the factors should be given equal weight, unless a disparate weighting is "due" by the circumstances. *Starbucks Corp. v. Wolfe's Borough Coffee Inc.,* 92 USPQ2d at 1775. Therefore, the weight given to each of the statutory factors is dependent upon the evidence introduced into the record. Each factor may vary in weight from case to case depending on the facts. The Court of Appeals for the Federal Circuit, when applying the likelihood of confusion factors established by the Court of Customs and Patent Appeals, held that in a particular case even a single du Pont factor may be dispositive. *Kellogg Co. v. Pack'em Enterprises Inc.*, 951 F.2d 330, 21 UPSQ2d 1142, 1145 (Fed. Cir. 1991). We find this approach to the weighing of factors equally applicable to our consideration of the statutory dilution factors (*i.e.,* the weight given to each of the statutory factors is dependent upon the evidence made of record). Thus, there is no prohibition to giving the statutory dilution factors more or less weight depending on the facts.

In discussing likelihood of confusion, we found that CAPITAL CITY BANK and CITIBANK are not similar because applicant's CAPITAL CITY BANK engenders a different commercial impression from opposer's CITIBANK mark. We find the marks of the parties are not essentially the same and, therefore, in the context of dilution, we also find that the marks are not substantially similar. Therefore, the similarity, or in this case, dissimilarity of the marks heavily favors applicant. *Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.,* 77 USPQ2d at 1514 (TTAB 2005) (dilution claim dismissed because the marks CAREFIRST and FIRSTCAROLINACARE are so dissimilar that consumers will not associate the marks).

    2.   <u>The degree of inherent or acquired distinctiveness of the famous mark.</u>

This factor requires us to analyze how distinctive or "unique" the mark is to the public. The inquiry is made even when it is undisputed that opposer's mark is registered on the Principal Register. *NASDAQ Stock Market Inc. v. Antartica S.r.l.,* 69 USPQ2d 1718, 1735 (TTAB 2003); *Toro Co. v. ToroHead Inc.,* 61 USPQ2d at 1176. "The more inherently distinctive and memorable the mark, the more it is likely to be blurred by the use of other identical or similar marks. The more descriptive the mark, the less likely it is to be blurred by uses of identical or similar marks." Testimony of Anne Gundelfinger, President, International Trademark

Association, before House Subcommittee on Courts, the Internet and Intellectual Property, Committee on the Judiciary, February 17, 2005 (109th Cong., 1st Sess.), 2005 WL 408425.

Registration No. 0691815 for the mark CITIBANK, in typed drawing form, is registered on the Principal Register without any claim of acquired distinctiveness. CITIBANK is a coined term derived from the combination of "City" and "Bank" from opposer's early use of "City Bank of New York." Although opposer is the only entity using the name "Citibank," third-parties use the term "City Bank" where the word "City" is part of a geographic designation (*e.g.*, Lake City Bank, Hastings City Bank) or where "City Bank" identifies a community bank (*e.g.*, City Bank of Lynwood, First City Bank). We find that CITIBANK, although inherently distinctive, is suggestive. Thus, this factor favors opposer.

3.  <u>The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark</u>.

As indicated above, although opposer is the sole user of CITIBANK, the term "City Bank" frequently has been adopted and used by third parties. In essence, to the extent that opposer is correct in arguing that the mere use of the words "City Bank" in another mark would dilute opposer's mark, such mark has already been diluted and the

registration of applicant's marks is not likely to cause any additional blurring of CITIBANK. Moreover, opposer's own enforcement policy contemplates uses that should be diluting under opposer's argument, so long as the user does not seek federal registration.[97]

4. The degree of recognition of the famous mark.

This Congressionally mandated factor seems redundant in view of the fact that opposer must establish that its mark is famous as a prerequisite for establishing a dilution claim. Nevertheless, it is a factor that we must consider in order to give meaning to the words in the statute. We conclude, therefore, that the degree of recognition of the famous mark requires us to determine the level of fame acquired by the famous mark. In other words, once the mark is determined to be famous as a prerequisite for dilution protection, we must apply a sliding scale to determine the extent of that protection (*i.e.,* the more famous the mark, the more likely there will be an association between the famous mark and the defendant's mark).

As indicated in our previous discussion regarding the fame of opposer's CITIBANK marks, we find that opposer's CITIBANK marks have achieved a high degree of recognition

---

[97] Opposer's Brief, pp. 24-25, *citing* Moses Dep., pp. 56-57, 144-147, and 158.

relative to other famous marks.  Accordingly, we find that this dilution factor favors opposer.

    5.    <u>Whether the user of the mark or trade name intended to create an association with the famous mark</u>.

There is no evidence that applicant intended to create an association with opposer's CITIBANK service marks.  In view thereof, this dilution factor favors applicant.

    6.    <u>Any actual association between the mark or trade name and the famous mark</u>.

There is no evidence of any actual association between applicant's CAPITAL CITY BANK service mark and opposer's CITIBANK marks.  Since we have no evidence on which to conclude that potential customers of applicant's services would make any association between the parties' marks when used in connection with their respective services, this dilution factor favors applicant.

    7.    <u>Balancing the factors</u>.

We have found that the marks are not substantially similar, that there are numerous third-party users of the term "City Bank," that there is no evidence demonstrating any association between the parties' marks, and that there is no evidence that applicant intended to create an association with opposer's marks outweigh the fame and distinctiveness of the CITIBANK marks.  Based on the record before us, opposer has not demonstrated that the

registration of applicant's marks will dilute its CITIBANK marks.

   **Decision:**   The opposition to the registration of applicant's marks is dismissed.